[Crim. No. 20624. Aug. 31, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LAVELLE FRIERSON, Defendant and Appellant.

[Crim. No. 20882. Aug. 31, 1979.]

In re LAVELLE FRIERSON on Habeas Corpus.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Charles M. Sevilla, Chief Assistant State Public Defender, Donald L. A. Kerson and Richard E. Ross, Deputy State Public Defenders, for Defendant and Appellant and for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHARDSON, J.**—Defendant Lavelle Frierson appeals from a judgment imposing the death penalty following his conviction of first degree murder and other lesser offenses. He also seeks a writ of habeas corpus based on his claim that he was ineffectively represented by his trial counsel. These proceedings have been consolidated so that they may be reviewed together. We have concluded that, while the contentions raised on defendant's appeal lack merit, the uncontradicted facts presented in his habeas corpus pleadings disclose that defendant was deprived of adequate and effective representation during both the guilt and penalty phases of his trial, and accordingly, we will reverse his conviction. We also will discuss those additional issues which are likely to arise on retrial including the constitutionality of the 1977 capital punishment legislation under which defendant was tried, convicted, and sentenced, and will uphold the death penalty statute.

We trace the procedural posture of the case, recite the factual circumstances surrounding defendant's offenses, and examine his successive contentions in the light of the applicable law.

In February 1978, defendant and codefendant Zondre Wooley were charged with murder (Pen. Code, § 187; all further statutory references are to that code unless otherwise cited), robbery (§ 211), kidnaping for purposes of robbery (§ 209), and assault with a deadly weapon (§ 245, subd. (a)). The information, as amended, alleged that the foregoing offenses were aggravated by firearm use (§§ 12022.5, 1203.06, subd. (a)(1)), and great bodily injury (§ 12022.7), and further charged that the

kidnaped victims suffered bodily harm (§ 209, subd. (a)). In addition, the information alleged that the murder was wilful, deliberate and premeditated and was physically committed by defendant Frierson during the commission of both a robbery (former § 190.2, subd. (c)(3)(i)) and a kidnaping (*id.,* subd. (c)(3)(ii)). In passing, we note that although the people, at the November 7, 1978, General Election adopted an initiative measure (Prop. 7) which broadened the application of the death penalty provisions (present §§ 190-190.5) we are concerned solely with the 1977 legislation (former § 190 et seq.; Stats. 1977, ch. 316).

Initially, a public defender was appointed to represent defendant, who entered a plea of not guilty. Shortly thereafter, defendant discharged his attorney and retained new private counsel to represent him. Pretrial motions to set aside the information (§ 995) to suppress evidence (§ 1538.5), and to order separate trials for each codefendant (§ 1098) were denied. The case was tried before a jury on July 20, 24, and 25, 1978, and on July 27, the jury found defendant guilty of each charged offense, and specified that the homicide was murder in the first degree and was wilful, deliberate and premeditated. The jury also found to be true all of the additional allegations of the information including the special circumstances which were alleged in connection with the murder charge.

The penalty phase was both commenced and concluded on July 31, 1978. Defense counsel called no witnesses and introduced no evidence. On August 1, after deliberating for seven hours, the jury fixed defendant's penalty at death. Defendant was thereupon sentenced to death for the murder, and to state prison for his other offenses as prescribed by law. Pursuant to section 1239 the appeal before us is automatic. As previously noted, defendant, through new counsel, also has submitted a petition for writ of habeas corpus alleging his trial counsel's ineffective representation. In response to the petition, we issued an order to show cause, and upon the filing of the People's return and defendant's traverse, the habeas corpus issues were fully joined. (See *In re Lawler* (1978) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257].)

The trial transcript reveals that on January 3, 1978, the victims Edgardo Kramer and Guillermo Bulnes, two Peruvian airline employees, drove to the Holly Aire Motel in Inglewood to visit a female named Chris. Bulnes knocked on the door to room 18, and a young woman, codefendant Wooley, opened the door whereupon Bulnes explained that he was looking for Chris, and apologized for his intrusion. Wooley responded *that Chris was not there,* offered Bulnes a "date" for $100, and, when he

declined, stated that she would call Chris for Bulnes. When Wooley walked to a nearby telephone booth Bulnes parked his car across the street from the motel driveway, and with Kramer then returned to Wooley, who informed them that Chris would arrive in one-half hour. The men thanked Wooley and reentered their car. Shortly thereafter, defendant approached the car and asked if the men were waiting for Chris. When Bulnes responded that they were, defendant removed a gun from his pocket, pointed it at Bulnes and cocked the hammer. Defendant thereupon entered the back seat of the car, ordered Bulnes to lock the door, start the car, and commence driving on a course directed by defendant.

During the ride, defendant removed the victims' wallets and watches. Although defendant told Bulnes not to look at him, Bulnes repeatedly turned and observed defendant's face. After travelling several blocks, defendant ordered Bulnes to park the vehicle, and thereupon shot both Bulnes and Kramer. Although Kramer apparently died instantly, Bulnes was able to grapple with defendant and to disarm him. Bulnes thereupon pointed the gun at defendant, opened the car door and left the vehicle.

After running a few steps Bulnes, who had been shot in the head, fell to the ground. Defendant thereupon seized him around the neck and attempted to retrieve the weapon. During the ensuing struggle Bulnes emptied the gun's chamber by firing it into the ground and then threw the firearm away. Defendant thereupon released his grip on Bulnes, who ran to a nearby street and was then driven to a hospital by a passing motorist. As Bulnes was entering the vehicle, he observed defendant walking in the general direction of the Holly Aire Motel.

Defendant and codefendant Wooley were subsequently arrested at the motel under circumstances which are described below in our discussion of defendant's contention that the officers lacked probable cause to arrest him.

The uncontradicted facts establish that defendant committed the homicide, robbery, kidnaping, and assault for which he was charged and convicted, and appellate counsel before us does not contend otherwise. Rather, on appeal (and in his habeas corpus petition) defendant makes the following claims: (1) The trial court's instructions regarding the defense of diminished capacity were inadequate and confusing; (2) his trial counsel was incompetent and ineffective; (3) certain evidence seized following defendant's arrest was inadmissible because the officers lacked

probable cause to arrest; (4) gruesome photographs were improperly admitted at the penalty trial; and (5) the 1977 death penalty statute under which defendant was tried (former § 190 et seq.) is unconstitutional under both the federal and state Constitutions. As will appear, of these several contentions which we now consider only the second has merit.

## 1. *Diminished Capacity Instructions*

At trial, Joe Perkins, an acquaintance of defendant testified that on the morning of January 3, 1978, defendant had taken an unspecified amount of the drug, Quaalude, after which defendant "act[ed] kind of drowsy, or act[ed] kinda dazed in his head, staring. He look at the ceiling and like [in] a daze." Another trial witness, Janet Johnson, described having been with defendant during the afternoon of the same day, and observed him ingest "angel dust" (phencyclidine or PCP) from 2 o'clock to 6 o'clock, and act "Spaced out. Just not normal." She also said that upon one prior occasion when defendant had used angel dust he "beat up" codefendant Wooley.

In rebuttal, Police Investigator Fry testified that during an interview with defendant shortly after his arrest, Fry observed that defendant's walk was normal, his speech clear and intelligible, and his eyes neither pinpointed nor dilated.

The trial court gave the jury extensive instructions on the subjects of diminished capacity, intoxication and unconsciousness. Among other directions, the jurors were correctly informed that: (1) If the evidence showed defendant's diminished capacity resulting from intoxication to a degree which prevented him from acting with malice (as defined in another instruction), then defendant could be found guilty of either voluntary or involuntary manslaughter but not murder; (2) if defendant killed while unconscious as a result of voluntary intoxication and was therefore unable to form a specific intent to kill or commit robbery, his killing would be involuntary manslaughter; (3) if defendant had diminished capacity because of intoxication, that fact might bear upon his ability to form the mental states necessary for the commission of murder and voluntary manslaughter (i.e., his ability to premeditate and deliberate upon the act or to form an intent to kill); (4) if defendant's intoxication prevented him from harboring either malice or an intent to kill, he could not be found guilty of second degree murder or voluntary manslaughter; (5) when a defendant is charged with a crime requiring a certain specific intent or mental state, the jurors must consider whether

defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming that requisite specific intent or mental state; and (6) if defendant was intoxicated at the time of the offense, that fact should be considered in determining whether defendant had a specific intent to kill.

Defendant contends that the trial court erred in failing to instruct additionally, *sua sponte,* that defendant's diminished capacity might rebut the specific intent required for the perpetration of robbery. He argues that such an instruction might have prevented the jury from finding defendant guilty of first degree murder under the felony-murder doctrine predicated upon a killing committed during the course of a robbery. (E.g., *People* v. *Tidwell* (1970) 3 Cal.3d 82, 87 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 391-393 [82 Cal.Rptr. 379, 461 P.2d 659].) He reasons that the jury was erroneously told that although the elements of malice and an intent to kill might be negated by evidence of intoxication, nevertheless the jury might return a verdict of first degree murder if it believed that defendant killed during commission of a robbery, because malice is implied in such a situation. Stated another way, defendant suggests that the jurors might have found defendant guilty of first degree murder despite his intoxicated condition, solely on the basis that he killed during commission of the robbery, thereby invoking the felony-murder rule.

Defendant's contention for such a *sua sponte* instruction fails for three reasons. First, although the crime of robbery was not mentioned specifically, the jurors were told in unequivocal language that intoxication could have prevented defendant from forming the requisite specific intent for *each* of the various crimes charged. This instruction immediately followed the giving of a series of instructions on the subject of special intent, including instructions that "In the crime of robbery, the necessary specific intent is to permanently deprive the owner of his property," and "In the crime of murder based on the Felony Murder Law, as in these instructions defined, the necessary specific intent is to commit the crime of robbery . . . ." Taken as a whole, the instructions were fully adequate to focus the jurors' attention upon the question whether defendant's intoxication may have prevented him from forming the requisite specific intent to commit robbery.

Second, our review of the record discloses that the evidence of defendant's diminished capacity was too insubstantial to warrant any *sua sponte* instructions on the subject. The instruction at issue is required

"whenever defendant makes *a sufficient factual showing of a diminished capacity* which would prevent him from forming the requisite specific intent which is a necessary element of the felony charged in a felony-murder prosecution. [Citations.]" (*People* v. *Tidwell, supra,* 3 Cal.3d 82, 87, italics added.) Conversely, "no such instructions need be given when there is no evidence from which a jury composed of reasonable men could have concluded that there was diminished capacity sufficient to negate the requisite criminal intent. [Citations.] The instructions need not be given when the evidence of diminished capacity is minimal. [Citation.]" (*People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]; see *People* v. *Terry* (1970) 2 Cal.3d 362, 400-401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Cisneros* (1973) 34 Cal.App.3d 399, 425-426 [110 Cal.Rptr. 269]; *People* v. *Cram* (1970) 12 Cal.App.3d 37, 42-45 [90 Cal.Rptr. 393].)

In the present case, defendant presented no evidence whatever, expert or otherwise, regarding the intoxicating effect, if any, which his use of undetermined amounts of Quaalude and angel dust may have had upon his ability to form the necessary intent to rob or kill. Nor was the matter shown to be one of common knowledge to an ordinary juror. In this regard, the case is comparable to that presented to us in *People* v. *Carr, supra,* wherein defendant claimed that he was improperly denied jury instructions on the subject of diminished capacity by reason of marijuana use. In *Carr,* we noted that "It has been held that merely showing that the defendant consumed some alcohol prior to commission of the crime without showing the effect of the alcohol on him is not sufficient to warrant an instruction on diminished capacity. [Citations.] Similar rules should apply to the consumption of marijuana. [¶] In the instant case, there is no evidence as to the amount of marijuana smoked. The only evidence as to the effect on defendant of the marijuana is that it gave him courage to carry out his criminal design. *Such evidence in no way negates his intent to commit his acts or his awareness of their wrongful nature.* [Citation.] . . . . [W]e are satisfied that, in the absence of evidence indicating the quantity of marijuana consumed or additional evidence reflecting the state of defendant's mind, a jury could not reasonably have concluded, in the light of the evidence in this case, that defendant by reason of intoxication did not premeditate or adequately deliberate." (Pp. 294-295, italics added.)

Similarly, in the present case, in the absence of evidence regarding the amount of drugs ingested by defendant and their effect upon his mental state, no reasonable juror would have concluded that defendant lacked a

specific intent to commit robbery. (We consider below defendant's separate and independent contention that his trial counsel's failure to investigate and present sufficient evidence of diminished capacity in general, and the nature and effect of drug ingestion in particular, deprived him of effective representation.)

Defendant advances an associated contention in suggesting that because the trial court did give several diminished capacity instructions, the evidence must have been sufficient to justify submitting the defense to the jury. (See *People* v. *Castillo* (1969) 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449].) We disagree. The applicable principle was well expressed in a recent case, "If the court through an abundance of caution, or neglect or mistake, gives partial instructions on diminished capacity . . . when no such instructions are warranted, it should not be ruled as a matter of law that all inquiry into the nature of the evidence on the issue is precluded . . . . [T]he People are entitled to a determination by [an appellate] court that the evidence of diminished capacity from intoxication was in this case unworthy of consideration." (*People* v. *Cisneros, supra,* 34 Cal.App.3d 399, 427; but see *People* v. *Griffin* (1971) 18 Cal.App.3d 864, 870 [96 Cal.Rptr. 218].)

Third, notwithstanding appropriate instructions regarding intoxication and diminished capacity as applied to the offense of first degree murder, the jury specifically found that defendant's homicide was "wilful, deliberate and premeditated," and that defendant acted "with the intent to cause death." Given this finding, it is reasonably probable that the jury implicitly and necessarily rejected the claim that defendant lacked the specific intent to commit robbery. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Accordingly, we conclude that the trial court did not err in failing to instruct *sua sponte* on the issue of diminished capacity as it pertains to the crime of robbery.

## 2. *Inadequacy of Trial Counsel*

Defendant asserts that his trial counsel was ineffective and afforded him inadequate representation during both the guilt and penalty phases of his trial. As will appear, we have concluded that although counsel's inadequacy does not appear on the face of the record on appeal, certain uncontradicted facts described in the pleadings in the habeas corpus

proceeding support defendant's contention and require reversal of his convictions.

(a) *Contentions on appeal.* Defendant's contentions on appeal are limited to the assertion that counsel failed (1) at the pretrial suppression hearing to impeach a police investigator with certain prior inconsistent statements which he had made concerning defendant's arrest, and (2) at the penalty phase to object to the admission of certain potentially prejudicial photographs.

■ The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence. As we recently observed "Matters involving trial tactics are matters 'as to which we will not ordinarily exercise judicial hindsight . . . .' [Citation.] ■ 'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel . . . .' [Citations.] . . . 'The choice of when to object or not is inherently a matter of trial tactics not ordinarily reviewable on appeal; failure to object does not necessarily indicate incompetence . . . .' " (*People* v. *Najera* (1972) 8 Cal.3d 504, 516-517 [105 Cal.Rptr. 345, 503 P.2d 1353]; see also *People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859]; *People* v. *Jenkins* (1975) 13 Cal.3d 749, 754-755 [119 Cal.Rptr. 705, 532 P.2d 857]; *People* v. *Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Thomas* (1974) 43 Cal.App.3d 862, 868-869 [118 Cal.Rptr. 226].)

Incompetence of trial counsel is not demonstrated on the face of the appellate record.

(b) *Contentions on habeas corpus.* Preliminarily, we note that in filing his habeas corpus petition contemporaneously with his appeal defendant adopts an appropriate procedural device. (See *People* v. *Pope, supra,* 23 Cal.3d 412, 426-427, fn. 17, and *People* v. *Corona* (1978) 80 Cal.App.3d 684, 706, fn. 10 [145 Cal.Rptr. 894].) While his habeas petition contains a variety of charges against his trial counsel, the central contentions are that counsel unreasonably failed to (1) investigate and present a diminished capacity defense, and (2) assemble and offer available mitigating evidence at the penalty phase.

(i) *Diminished capacity defense.* Defendant's sole defense at trial was an undeveloped theory of diminished capacity. Defendant himself never took the stand, but two witnesses testified that he had taken Quaalude and angel dust during the day of the murder, and that he appeared dazed or "spaced out." However, neither witness testified extensively regarding either the quantity or the effect of the drugs upon defendant's mental state or his ability to form the requisite specific intent. No expert witness was called to express any opinion on the subject. Accordingly, as we have explained, the evidence of defendant's diminished capacity was too insubstantial to require submission of the defense to the jury.

■■■ The present habeas corpus petition and traverse detail the circumstances surrounding the claim of diminished capacity in contending that trial counsel unreasonably failed to investigate and substantiate facts supporting the defense. According to the petition, counsel failed to request a psychiatric examination of defendant for the purpose of exploring defendant's mental condition. (See Evid. Code, § 1017.) He failed to consult any expert to determine whether the drugs ingested by defendant, either as to their nature or quantity, might have resulted in a diminished capacity to commit criminal acts. (See § 987.9.) In support of defendant's claim that a tenable diminished capacity defense could have been presented, appellate counsel has submitted a declaration by Ronald Siegel, a psychopharmacologist and psychologist serving both with the department of psychiatry at the University of California, Los Angeles, and with the psychopharmacology unit at the Brentwood Veterans Administration Hospital. Siegel's research with respect to PCP has led him to the conclusion that PCP intoxication "can resemble closely some forms of schizophrenia . . . [and] can show all the essential ingredients for . . . a [diminished capacity] defense . . . . PCP can diminish the capacity to form criminal intent . . . by interfering with the mental functions which are essential to the mental process of forming intent for an act." In the event of drug overdosages or chronic use, "the user may lack the essential mental elements to premeditate, deliberate, harbor malice, or form specific intents."

In addition, appellate counsel has submitted to us the declarations of several practicing attorneys who are experienced in the defense of capital and other criminal cases. These declarants, in expressing their opinions regarding the proper standards in the investigation and development of a diminished capacity defense to a murder case, uniformly agree that competent representation in cases involving the alleged use of PCP would have required, at a minimum, (1) investigative and expert assistance

regarding the drug and its probable effects upon defendant, as well as (2) the appointment of a psychologist or psychiatrist to investigate and assist counsel in the presentation of such a defense.

Finally, appellate counsel offers defendant's own declaration, which recites a history of drug use, including the smoking of angel dust on an average of three or four times a week during 1976 and 1977.

The People dispute the contention that defendant was afforded ineffective trial counsel. According to the return to the petition, supported by a declaration by defendant's trial counsel, counsel considered, but for tactical reasons rejected, the possibility of consulting or retaining a psychiatrist or other expert witness to support a theory of diminished capacity. Counsel asserts that he interviewed defendant on numerous occasions, that defendant appeared to counsel to be rational and without "mental abnormalities," and that defendant failed to disclose to him his prior history of drug involvement. Counsel concluded that, in the light of the evident "deliberateness" of the killing, a psychiatrist's testimony might "repel" the jury, and that the better tactic was to present the defense of drug intoxication "by means of lay 'street' witnesses . . . ." In counsel's words, his strategic plan was to "deemphasize the magnitude of the crime by playing down the case itself . . . so that the jury would feel that his was not a first degree murder case worthy of a death penalty."

In examining defendant's contention of inadequate representation, we think it significant that all of the material facts underlying defendant's argument are uncontradicted. The pleadings in the habeas corpus proceeding, including trial counsel's own declaration, furnish sufficient uncontested information to resolve the issue without resort to a reference for an evidentiary hearing. (See *In re Lawler, supra,* 23 Cal.3d 190, 194; *People* v. *Pope, supra,* 23 Cal.3d 412, 425-426; *People* v. *Corona, supra,* 80 Cal.App.3d 684, 706, fn. 10.) We turn, accordingly, to the applicable legal principles underlying defendant's contention.

█ Creating a new standard of measurement, we recently held that incompetence of *appointed* counsel is shown by proving ". . . that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope, supra,* 23 Cal.3d 412, 425.) █ In *Pope* we further stressed that to render reasonably competent assistance, an attorney bears certain basic responsibilities,

including the investigation of available defenses and, in an appropriate case, the obtaining of a psychiatric examination. (*Id.,* at pp. 424-425.) Where the record on its face discloses that counsel failed to investigate the facts in the manner required of a diligent and conscientious advocate, the conviction must be reversed because defendant thereby has been deprived of adequate assistance of counsel. (*Id.,* at pp. 425-426.) On the other hand, if the record fails affirmatively to disclose counsel's incompetence, the factual elicitation in a habeas corpus evidentiary hearing is the proper procedural remedy by which to test the competency issue. (*Id.,* at p. 426.)

■ The People contend that where, as here, defense counsel is voluntarily *retained* rather than *appointed* by the court, the appropriate test should be whether counsel's lack of competence or diligence "reduced the trial to a 'farce or a sham' [Citations.]," as enunciated by us in *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].

Although *Pope* involved the issue of appointed counsel and we did not expressly determine whether its new standard would apply to voluntarily retained counsel as well (23 Cal.3d at p. 421, fn. 9), we have previously anticipated the answer in holding that "If in the trial of a serious charge an appointed attorney *or even a chosen one* grossly neglects the preparation of the case the effect is to deny the defendant the right to counsel. [Citation.]" (*In re Rose* (1965) 62 Cal.2d 384, 386 [42 Cal.Rptr. 236, 398 P.2d 428], italics added.) In *Rose,* we further observed that while the fact that counsel is selected rather than appointed is "important," it is not "conclusive" of the question whether defendant was deprived of his right to effective counsel. (*Id.,* at p. 389; accord *People* v. *McDowell* (1968) 69 Cal.2d 737, 741, fn. 1 [73 Cal.Rptr. 1, 447 P.2d 97].) Our *McDowell* decision is close on point, for there we held that *retained* counsel rendered ineffective representation in failing to research and develop a diminished capacity defense, with the result that defendant was deprived of a crucial defense at trial.

We readily acknowledge that a few other jurisdictions have adopted a contrary view, based largely upon the absence of state action or involvement to a degree sufficient to support a due process claim. (See cases cited in Cook, Constitutional Rights of the Accused, Trial Rights (1974) § 42, pp. 119-121; Comment (1976) 89 Harv.L.Rev. 593, 598-599 and fn. 30; Note (1978) 67 Geo. L.J. 317, 520-521, and fn. 1489; see also *People* v. *Stevens* (1935) 5 Cal.2d 92, 98-99 [53 P.2d 133].) In *Pope,*

however, we explained that the right to competent counsel derives not exclusively from the due process clause, but also from the constitutional right (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) to the assistance of counsel. (23 Cal.3d at p. 422.) Moreover, in our view, it would be anomalous to hold that only those persons who do not bear the costs of their own defense are entitled to the protections of competent counsel afforded by the Sixth Amendment. (*Wilson* v. *Rose* (9th Cir. 1966) 366 F.2d 611, 615-616; see *United States* v. *Bosch* (1st Cir. 1978) 584 F.2d 1113, 1123, fn. 7; *United States* v. *Marshall* (9th Cir. 1973) 488 F.2d 1169, 1192-1193.)

Thus, we reaffirm the essence of our earlier expressions in *Rose* and *McDowell* in holding that *Pope's* new standard for measuring the effectiveness of counsel applies equally to both appointed and retained counsel. (Accord, *People* v. *Cooper* (1979) 94 Cal.App.3d 672, 681 [156 Cal.Rptr. 646].) Of course, the fact that counsel is retained remains an "important" consideration in measuring the effectiveness of counsel's representation.

■ Was defendant afforded effective trial representation? In *Pope,* as here, the appellant urged among other things that his trial counsel failed to develop and present a diminished capacity defense. We noted that, given substantial evidence of appellant's mental retardation, this potentially meritorious defense was "certainly crucial." (23 Cal.3d at p. 427.) Our statements in *Pope* regarding the crucial nature of a potentially meritorious diminished capacity defense are mirrored in the controlling principles expressed in earlier cases which had employed the "farce or sham" standard of effective counsel. (See, e.g., *People* v. *Stanworth* (1974) 11 Cal.3d 588, 612 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Miller* (1972) 7 Cal.3d 562, 570 [102 Cal.Rptr. 841, 498 P.2d 1089]; *In re Saunders* (1970) 2 Cal.3d 1033, 1048-1049 [88 Cal.Rptr. 633, 472 P.2d 921]; *People* v. *McDowell, supra,* 69 Cal.2d 737, 750-751.) In *Saunders,* for example, we issued a writ of habeas corpus to reverse a criminal conviction, on the basis of uncontradicted allegations to the effect that Saunders' trial counsel had decided to withhold the issue of diminished capacity from trial *without first investigating the availability of such a defense.* As we noted in *Saunders,* "counsel's decision was made without the benefit of *substantial factual inquiry* into the specifics of petitioner's mental condition . . . . [H]e undertook no serious efforts to obtain available medical reports . . . [or] to have petitioner examined by a psychiatrist . . . . [¶] Although counsel's decision not to raise the defense . . . was made for 'tactical' and 'strategic' reasons sufficient in

counsel's judgment to support it, in the circumstances of this case the failure of counsel to avail himself of information relevant to the defense removed all rational support from that decision . . . . By failing to make any effort at all to follow the lead afforded by information in his possession counsel precluded himself from making a rational decision on the question . . . . [¶] Moreover, the possible defense so withheld must be termed a 'crucial' one—*especially in view of the insubstantiality of the defense actually offered.* [Citations.]" (*In re Saunders, supra,* 2 Cal.3d at pp. 1048-1049, italics added.)

In the present case, despite his admitted awareness of the possibility of developing a successful diminished capacity defense, trial counsel neglected either to seek or obtain an expert appraisal of defendant's mental condition or of the effect of the drug PCP upon his physical and mental condition. Although, unlike *Saunders,* counsel here did attempt to assert a diminished capacity defense, nevertheless it was doomed to failure in the absence of any competent evidence supporting it. By his inaction, deliberate or otherwise, counsel deprived himself of the reasonable bases upon which to reach *informed* tactical and strategic trial decisions. Most importantly, the defense of diminished capacity was certainly *crucial,* for it represented defendant's *sole* defense to the serious, indeed ultimate, crimes with which he was charged. The situation thus became comparable to that presented in *People* v. *Corona, supra,* 80 Cal.App.3d 684, wherein defense counsel called no witnesses and presented no defense at trial other than to cross-examine prosecution witnesses. Commenting upon these facts Justice Kane, on behalf of the *Corona* court, observed at page 719, "Under these circumstances the defense based on appellant's mental incompetence and legal insanity was not only a 'crucial,' but the 'sole' defense in the case. To give up the mental incapacity defense in this situation was tantamount to a total withdrawal of any legal defense, a complete abandonment of the interest of the accused." In the life or death context within which they occurred, counsel's actions on the matter presently before us may be similarly characterized. (See also *In re Miller* (1973) 33 Cal.App.3d 1005, 1020-1021 [109 Cal.Rptr. 648] [diminished capacity was sole possible defense, yet counsel failed to investigate].)

The People's return to the order to show cause characterizes counsel's efforts as "tactical" decisions which should be insulated from judicial second-guessing. Yet we have said that even tactical decisions may demonstrate incompetence if made without the benefit of "substantial factual inquiry." (*In re Saunders, supra,* 2 Cal.3d 1033, 1048-1049.) Here, it is uncontradicted that although counsel knew that his .client assertedly

had used drugs, including angel dust, during the day of the crimes in question, he failed to seek or secure either a psychiatric examination or other expert evaluation on the probable effect of that drug upon defendant's mental condition at the time of the offenses. In a capital case a reasonably diligent preliminary investigation of this type is necessary to provide the factual framework within which to make a competent, informed tactical decision regarding the most effective presentation of a diminished capacity defense. (See, e.g., ABA Project on Minimum Standards for Crim. Justice, Stds. Relating to the Prosecution Function and the Defense Function (Approved Draft 1971) std. 4.1 and com. at p. 227.)

Had counsel herein undertaken such an investigation, he might well have learned that, as previously indicated in Mr. Siegel's declaration, ingestion of angel dust may significantly diminish the actor's capacity to form a criminal intent. (See, e.g., Bernheim, Defense of Narcotics Cases (1978 rev. ed.) § 7.32A, pp. 7-57.) Evidence of this general nature was essential to the presentation of a tenable diminished capacity defense in this case, and such evidence could not be effectively presented through lay witnesses.

We should not be understood as requiring that trial counsel must seek psychiatric or expert advice in every case wherein drug intoxication is a possible defense. ■ Yet in a capital case, where diminished capacity appears to be the *sole* potentially meritorious defense, and counsel has in fact elected to present such a defense at trial, counsel must be expected to take those reasonable measures to investigate the factual framework underlying the defense preliminary to the exercise of an informed choice among the available tactical options, if any. ■ In the present case, we need not speculate as to the likely prejudicial effect of counsel's omissions, for counsel's failure to take reasonable investigative measures actually resulted in the presentation to the jury of an incomplete, undeveloped diminished capacity defense. We conclude that defendant was thereby deprived of his right to effective trial counsel.

(ii) *Failure to call mitigating witnesses.* ■ The defense failed to submit any evidence whatever at defendant's penalty trial. Although citing no legal authority in support of the contention, appellate counsel now urge that such conduct amounted to a callous disregard of defendant's interests, reflecting trial counsel's incompetence. Defendant has submitted declarations from several practicing lawyers who are

experienced in the defense of capital cases, each of whom expresses the view that reasonably competent representation would necessarily include presentation of mitigating evidence, through lay or expert witnesses, which might induce the jury to reject the death penalty.

The habeas corpus petition further offers several declarations from relatives, friends and acquaintances of defendant containing material which conceivably might have mitigated his conduct. For example, defendant's mother reviewed certain explanatory circumstances surrounding his youth and family difficulties, and an adult friend declared that he had never seen defendant exhibit any signs of violence or hostility. Although these declarations are of doubtful legal significance, they do demonstrate the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared.

The applicable legislation contemplates presentation of evidence in varied forms. Under former section 190.3, subdivision (j), the trier of fact in determining the penalty is required to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." In addition, the section permits the presentation of mitigating evidence of "the defendant's character, background, history, mental condition and physical condition." It seems highly unlikely that trial counsel, by the exercise of reasonable diligence, would have been unable to locate a single witness willing to present some mitigating testimony invited by this section.

In the return filed by the People, defendant's trial counsel asserts that he had unsuccessfully attempted to locate "friendly" witnesses who might testify on behalf of defendant at the penalty phase. According to counsel, such witnesses would have been subject to intense cross-examination and impeachment, and would have been required to reveal any adverse facts they knew regarding defendant's character. In addition, trial counsel concludes that "Tactically I determined that no evidence of mitigating factors would be presented at the penalty phase so as to minimize the People's case and to impress the jury with *the weight of the prosecution's burden.*" (Italics added.) Moreover, defendant himself was not called because of counsel's opinion that "he would make a poor witness."

If the foregoing remarks indicate counsel's belief that the prosecution had the burden of proving to the jury the appropriateness of the death penalty, counsel seriously misunderstood the law. (See, e.g., *People v. McDowell, supra,* 69 Cal.2d 737, 748-751.) Under the 1977 death penalty

law, the trier of fact was required to "consider, take into account and be guided by the aggravating and mitigating circumstances" in determining the proper penalty. (Former § 190.3.) The People took full advantage of their right to introduce *aggravating* evidence, including defendant's prior killing of a 15-year-old boy, his prior armed robberies shortly before the present offenses, and his apparent callous and indifferent attitude toward the taking of human life. Trial counsel's conduct, rather than emphasizing the People's "burden," simply underscored the absence of any *mitigating* circumstances in this case, greatly enhancing the likelihood that a verdict of death would· be returned. Moreover, such a result, in our view, was reasonably foreseeable.

There is a risk of "second-guessing" trial counsel after the event. ■ Nonetheless, while acknowledging the wide latitude and discretion necessarily vested in trial counsel in the area of tactics and strategy, we stress that the exercise of that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and founded upon reasonable investigation and preparation.

We contrast the case before us with *People* v. *Durham* (1969) 70 Cal.2d 171, 191-192 [74 Cal.Rptr. 262, 449 P.2d 198], wherein we rejected a contention that trial counsel's failure to present mitigating evidence in a capital case conclusively demonstrated his ineffective representation. In *Durham,* we specifically noted that counsel had marshalled "a spirited and able defense" at the guilt phase of the case, and that the jury had been instructed to consider *all* trial evidence in determining the penalty. (P. 191, fn. 18.) Since defendant in *Durham* failed to point to any specific mitigating evidence which might have been presented, and since trial counsel conducted substantial cross-examination of the People's witnesses and presented a well-reasoned argument to the jury at the penalty phase, we concluded that under the "totality of circumstances," defendant failed to establish inadequacy of counsel. (P. 192.)

■ In the present case, in contrast and as previously noted, trial counsel presented neither a tenable defense at the guilt phase, nor any evidence whatever on the penalty issue, although defendant has pointed to some available mitigating testimony. We conclude that defendant was deprived of effective counsel in both the guilt and penalty aspects of his trial.

Although defendant's conviction must be reversed, we deem it appropriate for the guidance of the court to resolve certain of the remaining contentions pertaining to matters which are likely to recur upon retrial. (See, e.g., *People* v. *Gainer* (1977) 19 Cal.3d 835, 857 [139 Cal.Rptr. 861, 566 P.2d 997]; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1165 [80 Cal.Rptr. 920, 459 P. 248]; Code Civ. Proc., § 43.)

### 3. *Probable Cause to Arrest Defendant*

The facts underlying defendant's arrest are derived from the testimony given at a pretrial suppression hearing. (§ 1538.5.) At 11 p.m. on January 3, 1978, Officer Farrell proceeded to the Centinella Hospital in Inglewood to interview victim Bulnes, who described the facts of the kidnaping, robbery and shootings. In recounting these events, Bulnes mistakenly told Farrell that he had encountered the codefendant Wooley at room 17 of the Holly Aire Motel, rather than at room 18. Bulnes also stated that his assailant had first appeared "from the area of room 17."

Bulnes told Farrell of the objects taken from him and Kramer, and he also gave Farrell a full description of the two suspects, by age, sex, race, color of hair and eyes, size, and clothing. Bulnes also gave Farrell a description of Chris.

Near midnight on January 3-4, and after Kramer's body had been discovered in the abandoned vehicle, Officer Farrell relayed the foregoing information (description of suspects, stolen property and underlying circumstances) to Homicide Investigators Fry and DiGerlando. The investigators proceeded to the scene of the reported crimes, and searched unsuccessfully for the murder weapon. Thereafter, accompanied by uniformed officers, they drove to the Holly Aire Motel and, between 3:30 a.m. and 4 a.m., approached the door to room 17.

Investigator Fry knocked on the door, identified himself, stated that he was conducting a homicide investigation, and asked to be admitted. While Fry was engaged in conversation with an unseen occupant of number 17, Investigator DiGerlando observed through the window of room 18 a woman matching the description of Wooley as given by Bulnes. Room 18 was contiguous to number 17; the door to the two rooms hinged on a common doorjamb and opened inward against a common wall. DiGerlando directed the woman in number 18 to remain inside.

The officers forcibly entered room 17, observed that the occupants were a man, a pregnant woman, and two children, and thereupon concluded that they had entered the wrong room. DiGerlando then informed Fry that in room 18 he had seen a woman matching Bulnes' description of Wooley. While other officers remained in front of room 18, Fry went to the motel manager's office and inquired whether two women matching Bulnes' description of Wooley and Chris occupied any of the rooms. The manager replied that a woman generally matching the description of Wooley lived in room 18, and that a woman fitting Chris' description occasionally spent the night in that room. The manager also informed Fry that room 18 was presently occupied by a man generally matching defendant's description.

The officers thereupon decided to interrogate the occupants of room 18. (At trial, Fry testified that at the time he believed the male occupant of room 18 might be the man who had shot Kramer and Bulnes, and that the occupants might have been in the process either of escaping through a rear window or of destroying or concealing evidence. DiGerlando testified that he believed the woman he had observed in room 18 "possibly set up the robbery and the homicide.") Fry knocked repeatedly on the door of room 18, identified himself, stated that he was conducting a homicide investigation, and demanded entry. After receiving no response, Fry walked to the manager's office, obtained a key to room 18, and returned to the door of the room. While Fry was further announcing his presence and purpose, DiGerlando heard voices within room 18 and concluded that the occupants might be attempting to flee, to destroy evidence, or to arm themselves.

After unsuccessfully attempting to unlock the door, the officers kicked the door open and entered. DiGerlando observed defendant and Wooley standing next to a bed; in plain view were numerous watches on a dresser immediately inside the door. DiGerlando also observed a pair of wet, muddy and possibly bloody tennis shoes inside the entry to the bathroom. According to DiGerlando both suspects consented to a search of the apartment. At the hearing, both defendant and Wooley denied that they had agreed to the ensuing police search which produced watches belonging to Bulnes and Kramer as well as other incriminating evidence which was admitted at trial.

██ Preliminarily, we observe that defendant's argument concerning the validity of his arrest is a limited one, raising the sole question whether the officers had *probable cause* to enter room 18 and arrest him. No

contention is made that the arrest was improper because of a failure to obtain an arrest warrant (see *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-276 [127 Cal.Rptr. 629, 545 P.2d 1333]) and we can thereby assume that counsel concedes the existence of exigent circumstances which would permit a warrantless arrest on probable cause. The surrounding circumstances readily suggest the possible imminent escape of the suspects or their destruction or concealment of evidence (see *United States* v. *Santana* (1976) 427 U.S. 38, 43 [49 L.Ed.2d 300, 305-306, 96 S.Ct. 2406]; *Ramey*, p. 276), and the further likelihood that one of the suspects may have been an armed killer (see *James* v. *Superior Court* (1978) 87 Cal.App.3d 985, 991, 994 [151 Cal.Rptr. 270]). Nor does appellate counsel contend that the officers violated the so-called "knock and notice" provisions of section 844 when they forcibly entered room 18. (See *Duke* v. *Superior Court* (1969) 1 Cal.3d 314 [82 Cal.Rptr. 348, 461 P.2d 628].)

With respect to the issue of probable cause, we recently observed that "Cause for arrest exists when the facts known to the arresting officer 'would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' [Citations.]" (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) In similar fashion, we have also held that "Probable cause to arrest without a warrant represents an *objective* legal standard by which to measure the reasonableness and sufficiency of the officer's *subjective* beliefs that the defendant has committed an offense. [Citations.]" (*People* v. *Miller* (1972) 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228], italics in original.)

The record establishes that the arresting officers possessed the requisite subjective belief or strong suspicion that the occupants of room 18 were the persons responsible for the offenses under investigation. Relying primarily upon the fact that Bulnes described room 17 as the scene of his initial confrontation with Wooley, defendant contends that the officers' beliefs were unreasonable, judged by the objective standard enunciated in *Miller*, supra. According to defendant, once the officers discovered the inaccuracy of Bulnes' information in this regard, their further reliance upon Bulnes was unreasonable as a matter of law.

We have generally been guided, however, by less strict considerations. In *People* v. *Ramey*, *supra*, 16 Cal.3d 263, 269, we stated "as a general proposition that private citizens who are witnesses to or victims of a criminal act, absent some circumstances that would cast doubt upon their information, should be considered reliable." The fact that Bulnes was

mistaken regarding the precise room number would not necessarily cast doubt upon the remainder of the information which he furnished, including the description of the participants and other circumstances surrounding the commission of the crimes. As recently expressed by one commentator, "The arresting officer must be allowed to take account of the possibility that the victim or witness has been in error with respect to part of [his or her information] . . . ." (1 La Fave, Search and Seizure (1978) § 3.4, at p. 614.)

In any event, once the officers learned of the mistake, they took immediate steps to ascertain the correct room number of the suspects by interrogating the motel manager before approaching the occupants of room 18. This was reasonable. The manager's confirmation that persons matching the suspects' general description occupied that room, coupled with the facts (1) of the contiguity of rooms 17 and 18, and (2) of the refusal of the occupants of room 18 to respond to the officers' inquiries, in the aggregate furnished reasonable and probable cause to justify the officers' decision forcibly to enter room 18.

These same facts, in combination, also answer defendant's further observation that Bulnes' descriptions of defendant, Wooley and Chris was rather general and could readily have matched many persons living in the area. The applicable principle has been well expressed by La Fave, *supra,* "[A] description which would fit many people will not suffice [to afford probable cause]. But the chances of a certain description fitting several persons in turn depends upon the number of persons in the relevant universe." (§ 3.4, at p. 615.)

In view of our conclusion that defendant's arrest was proper, we need not consider the further question whether admission of the evidence procured as a result of that arrest was harmless beyond a reasonable doubt. We do observe, however, that there was admitted at trial substantial evidence of defendant's guilt apart from the physical evidence seized at defendant's apartment. This evidence included: (1) Bulnes' eyewitness identification of defendant, (2) defendant's admission to a jail cellmate, Jimmy Walker, that he had committed the crimes in question, and (3) defendant's failure to offer any defense whatever, except testimony that he had used drugs on the day in question. Although Bulnes had earlier been unable to select defendant's photograph from a group of six photographs shown to him following defendant's arrest, he did identify codefendant Wooley's photograph. In addition, at trial, Bulnes explained that he had several opportunities to observe defendant's

face during the robbery, and in his words that "I just pictured his nose from his size [side?] and his mouth to recognize him later when I see him person-to-person."

The police had ample cause to arrest defendant.

4. *Admission of Photographs of Victim*

At the penalty trial, the prosecution introduced evidence that defendant had committed a prior homicide when he was 15 years old. This victim's brother verified the fact of the earlier killing and authenticated three photographs of his dead brother. These photographs, taken shortly after the event, disclose bloody bullet wounds in and around the victim's face.

Defendant concedes that evidence of the earlier murder was relevant as a possibly aggravating circumstance which might justify imposition of the death penalty. (See former § 190.3.) Yet defendant disputes the relevance of the photographs, contending that the evidence was "offered and admitted solely to play on the prejudices of the jury." This issue has arisen with frequency and the applicable principles are well established. The admission of photographs of victims lies primarily within the discretion of the trial judge who determines whether their probative value is outweighed by their prejudicial effect. (*People* v. *Milan* (1973) 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 363 [105 Cal.Rptr. 138, 503 P.2d 594]; Evid. Code, § 352.) Photographs which disclose the manner in which a victim was wounded are "relevant on the issues of malice [citations] *and aggravation of the crime and the penalty* [citations]." (*Murphy,* at p. 365, italics added; accord, *People* v. *Talbot* (1966) 64 Cal.2d 691, 708 [51 Cal.Rptr. 417, 414 P.2d 633].)

As we have recently noted, "the photograph was . . . highly relevant evidence on the issue of malice. . . . '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant. . . .' " (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) We cannot hold that the trial judge in the instant case abused his discretion in admitting the photographs. Moreover, trial counsel failed to object to their admission into evidence, and although this failure ordinarily would bar appellate consideration of the issue, such failure may illustrate yet another instance of incompetence. (See *Murphy,* at p. 363.)

### 5. *The Death Penalty*

We examine the constitutional foundations of the California death penalty legislation. As previously noted, defendant contends that the 1977 statute in effect at the time he committed the offenses (former § 190 et seq.) is invalid under both federal and state charters. Although we will reverse defendant's conviction on the ground of inadequate counsel, nevertheless we review and resolve the constitutional challenges to the laws which will govern the retrial of this case.

Several compelling reasons move us to do so. First, it is proper that we promptly and clearly express our views either upholding the penalty or specifically defining any constitutional defects which we discern in the death penalty procedures. Since 1972 the sovereign people of this state twice directly, and through their elected representatives on other occasions, have mounted a continuous, strong, and joint effort to restore the death penalty as a permissible form of punishment. They are entitled to know whether they have adopted a valid sanction. Regardless of our personal moral or ethical convictions or preferences, and no matter how strongly held, fundamental principles of fairness demand that, as the final legal arbiters in this state to whom all death sentences are automatically appealed, we should speak on the issue of constitutionality. We should do so at the earliest practicable opportunity and when the procedural posture of the case is appropriate for the expression of our views. This has been our tradition. Thus, in *Rockwell* v. *Superior Court, supra,* 18 Cal.3d 420, we recently intervened in the trial of a capital case, after defendant had been convicted of first degree murder, and a mistrial was declared when the jury was unable to agree on the trial of the special circumstances allegations. Before retrial of these issues, and before imposition of any penalty whatever, we addressed the constitutionality of the 1973 death penalty law and issued our peremptory writ of prohibition thus preventing further trial of the special circumstances issue. While our review readily could have been postponed until after completion of the trial and possible imposition of the death penalty, we examined the issue before the retrial.

Second, sound principles of judicial administration in light of numerous capital cases currently being tried, call for a ruling on the subject, in order that trial courts may be properly advised of their constitutional responsibilities under the 1977 legislation, as we construe that statute. Moreover, although the 1977 law has been modified in certain respects by the new 1978 legislation, much of our discussion regarding the constitu-

tionality of the death penalty as a permissible form of punishment in this state applies with equal force to the 1978 law.

Third, if the people and the Legislature are correct in their assumption that the penalty acts as a deterrent, then it is possible that some persons contemplating the commission of capital crimes may be diverted by a clear and unqualified ruling upholding the constitutionality of the death penalty.

In short, we acknowledge and accept our responsibility to achieve a prompt, definitive resolution of the constitutional challenges raised before us. Such duty is owed to the people and to their Legislature, and to the trial courts which are charged with the continuing interim enforcement of the statute.

(a) *Background.* On February 17, 1972, we declared an earlier version of the death penalty unconstitutional as constituting cruel or unusual punishment under former article I, section 6 (present § 17), of the California Constitution. (*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].) On November 7 of the same year, the people responded by adopting, through initiative, a constitutional amendment which added article I, section 27, providing that "All statutes of this state in effect on February 17, 1972, requiring, authorizing, imposing, or relating to the death penalty are in full force and effect, *subject to legislative amendment or repeal by statute, initiative, or referendum.* [¶] The death penalty provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article I, Section 6 nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution." (Italics added.)

Shortly before the people's approval of article I, section 27, however, the United States Supreme Court had held that imposition of the death penalty under a Georgia statute was invalid as cruel and unusual punishment under the Eighth and Fourteenth Amendments to the federal Constitution. (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].) Although diverse opinions were filed by the various high court justices in *Furman,* the case has been authoritatively interpreted as holding that the death penalty cannot "be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner . . . . [¶] *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the

determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 188-189 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909] [plurality opn. of Stewart, Powell, Stevens, JJ.]; see also *Rockwell* v. *Superior Court, supra,* 18 Cal.3d 420, 430.)

Following the *Furman* decision, in 1973 the California Legislature adopted a new death penalty statute in an obvious attempt to meet the objections raised in *Furman*. This new statute provided for a *mandatory* death penalty when certain special circumstances were found to exist, thereby divesting the jury of its former absolute discretion over the matter. In 1976, however, in a series of five cases, the United States Supreme Court construed similar state mandatory death penalty statutes, invalidating two of them on the ground that they failed to provide the sentencing authority with the option to impose a sentence other than death, guided by sufficient standards to assure against arbitrariness and discrimination in the application of the death penalty. (*Gregg* v. *Georgia, supra,* 428 U.S. 153; *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960]; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001]; hereafter these cases will be jointly referred to as *Gregg* v. *Georgia* et al.; see also, *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954].)

In *Gregg* v. *Georgia* et al., the high court upheld the discretionary death penalty statutes of Georgia, Florida, and Texas and struck down the mandatory laws of North Carolina and Louisiana. We can assume that the plurality opinions signed by Justices Stewart, Powell, and Stevens in these five cases represent the probable majority view of the court regarding the minimum federal constitutional prerequisites to a valid death penalty law, because three other justices and the Chief Justice would have upheld even the mandatory statutes. (See *Rockwell, supra,* 18 Cal.3d at pp. 430-435, for a description of the various separate opinions in these cases.) Accordingly, in this opinion we will concentrate primarily upon the pronouncements contained in the foregoing plurality opinions.

In 1976, relying upon *Gregg* v. *Georgia* et al., we declared invalid California's 1973 mandatory death penalty law. (*Rockwell* v. *Superior Court, supra,* 18 Cal.3d 420.) Thereafter, in 1977, the Legislature enacted the death penalty statute which is under our present scrutiny. As

previously noted, we do not consider the validity of the newly enacted 1978 death penalty act, beyond observing that the general procedural framework of the 1977 and 1978 laws is substantially identical and some of the 1977 provisions have been deleted or amended by the new law. Further statutory references are to the 1977 law.

In summarizing only some of its main provisions, we note that the 1977 legislation repealed the prior, mandatory statute and adopted an essentially new system whereby the trier of fact, upon proof of certain enumerated "special circumstances" (§ 190.2, subds. (a), (b), (c)), must determine whether the penalty shall be death or life imprisonment without possibility of parole (§ 190.3).

Among the various special circumstances which must be found to permit a death sentence are murder for hire, murder through explosives, murder of a peace officer, murder of a witness to a crime, or murder (if "willful, deliberate, and premeditated") during a robbery, kidnaping, forcible rape, lewd act upon a child, or burglary, murder by torture, and murder by one previously convicted of murder. (§ 190.2.) "In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true." (§ 190.4, subd. (a).)

The mitigating and aggravating factors which the trier of fact may consider in determining the penalty once a special circumstance is found to exist include the nature of the crime and the special circumstances, defendant's prior violent criminal activity, defendant's "extreme mental or emotional disturbance" during the offense, the victim's consent or participation, defendant's reasonable belief of moral justification or extenuation, duress or domination of defendant by another person, impairment of defendant's mental capacity by mental disease or intoxication, defendant's age at the time of the crime, defendant's relatively minor participation as an accomplice, and "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, subds. (a) through (j).) The 1977 version of section 190.3 also provided that "After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole."

In addition, under section 190.4, following a jury verdict or finding imposing a death penalty, defendant is deemed to have made a motion to

modify the verdict (see § 1181, subd. (7)). In ruling on the motion, the judge "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. He shall state on the record the reason for his findings. [¶] The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. [¶] The denial of the modification of a death penalty verdict . . . shall be reviewed on the defendant's automatic appeal . . . ." (§ 190.4, subd. (e).)

(b) ▆▆ *Sentencing discretion.* Defendant first contends that the 1977 legislation fails to limit and direct the jury's sentencing discretion in the manner required by *Gregg* v. *Georgia* et al. According to defendant, the challenged procedure leaves the jury with the same "unguided and unchecked discretion" condemned by the Supreme Court in *Furman* v. *Georgia, supra,* 408 U.S. 238. Defendant urges that the 1977 law contains substantially the same constitutional defects which characterized California's invalid "pre-*Furman*" death penalty law, because both laws allow the jury to consider the same kinds of evidence and sentencing factors. A careful examination of the applicable cases convinces us that the 1977 California statute, rather, is identical in substance to the statutory schemes recently upheld by the high court in *Gregg* v. *Georgia* et al., leading us to conclude that the California legislation will successfully pass similar constitutional review.

In *Gregg,* for example, the plurality opinion (Stewart, Powell, Stevens, JJ.) stressed that the Georgia statute in question specified 10 aggravating circumstances, one of which had to be found to exist beyond a reasonable doubt, before sentence could be imposed. (428 U.S. at pp. 196-197 [49 L.Ed.2d at pp. 887-888].) In addition, the justices observed that the Georgia statute permitted a jury to consider any other aggravating or mitigating circumstances in determining whether the death penalty should be imposed. (*Ibid.*) In *Rockwell, supra,* we described these aggravating and mitigating circumstances as "aspects of the Georgia scheme which a majority of the court considered essential to its constitutionality . . . ." (18 Cal.3d at p. 432.) According to the *Gregg* plurality, "These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the

specific circumstances of the crime . . . . In addition, the jury's attention is focused on the characteristics of the person who committed the crime . . . . As a result, while some jury discretion still exists, 'the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application.' [Citation.]" (Pp. 197-198 [49 L.Ed.2d at p. 888].)

It is further significant that the Florida statute upheld in *Proffitt* v. *Florida, supra,* 428 U.S. 242, resembles the 1977 California statute, perhaps even more closely than the Georgia model. In Florida, an advisory jury is directed to consider " '[w]hether sufficient mitigating circumstances exist . . . which outweigh the aggravating circumstances found to exist; and . . . [b]ased on these considerations, whether the defendant should be sentenced to life [imprisonment] or death.' " (*Id.,* at p. 248 [49 L.Ed.2d at p. 921].) The Florida statute contains a list of the aggravating and mitigating factors to be considered. The trial judges under both Florida and California procedures perform the same weighing function in determining sentence following the jury's recommendation; the judge must specify in writing the findings upon which the death sentence is based. (*Id.,* at p. 250 [49 L.Ed.2d at pp. 921-922].) As the plurality opinion in *Proffitt* stresses, "On their face these procedures, like those used in Georgia, appear to meet the constitutional deficiencies identified in *Furman.* The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant." (*Id.,* at p. 251 [49 L.Ed.2d at p. 922].)

We find worthy of note that the aggravating and mitigating factors enumerated in the Florida statute are almost identical to the special circumstances, and the aggravating and mitigating factors, described in the California act. (See 428 U.S. at pp. 248-249, fn. 6 [49 L.Ed.2d at p. 921].) Thus, although the California law would permit the trier of fact to consider evidence as to "any matter" relevant to mitigation or aggravation (§ 190.3), the trier of fact is not left wholly unchecked and unguided in its determination for, as in Florida, the California statute lists specific factors which must be considered in deciding whether or not to impose the death penalty. (*Ibid.*) Indeed, in the present case, following its verdict of first degree murder and its finding of special circumstances authorizing imposition of the death penalty, the jury was instructed by the trial court to "take into account and be binded [guided?] by the

following factors, if applicable," listing the 10 factors specified in section 190.3.

It is argued that the 10th and final statutory mitigating factor, namely, "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" (§ 190.3, subd. (j)) is fatal because it is so broad as to confer, in effect, unbridled discretion on the trier of fact with regard to the penalty issue. The decisions of the United States Supreme Court refute the contention. The three types of death penalty statutes upheld in *Gregg* v. *Georgia* et al. in each instance permit the defendant similar latitude in the selection and admission of mitigating evidence. (See *Gregg,* at pp. 164, 200-204 [49 L.Ed.2d at pp. 869-870, 889-892]; *Proffitt,* at pp. 250, 257-258, fn. 8 [49 L.Ed.2d at pp. 921-922, 925-926]; *Jurek,* at pp. 271-274 [49 L.Ed.2d at pp. 938-940].) Indeed, in a recent opinion invalidating the Ohio death penalty statute, the high court in amplification, stated unequivocally that "the Eighth and Fourteenth Amendments *require* that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances* of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990], fns. omitted, italics added.)

We conclude that the 1977 death penalty law is not invalid for its failure to provide any narrower standards of sentencing discretion.

(c) ▆ *Findings.* Defendant asserts the invalidity of the 1977 law because it fails to require the trier of fact to prepare written findings explaining the basis for its decision to impose the death penalty. Defendant stresses that the Georgia statute upheld in *Gregg* requires that the sentencing authority specify the aggravating circumstances which were found to exist (428 U.S. at p. 166 [49 L.Ed.2d at p. 870]), and that the *Gregg* court stated that this provision constituted a "further safeguard of meaningful appellate review . . . available to ensure that death sentences are not imposed capriciously or in a freakish manner" (*id.,* at p. 195 [49 L.Ed.2d at p. 887]; see also *Gardner* v. *Florida* (1977) 430 U.S. 349, 361 [51 L.Ed.2d 393, 404, 97 S.Ct. 1197] [trial court's improper undisclosed reliance upon investigation report in death penalty case]).

In addition, however, the *Gregg* court further explained that "We do not intend to suggest that only the above-described procedures would be permissible under *Furman* . . . for each distinct system must be examined

on an individual basis." (428 U.S. at p. 195 [49 L.Ed.2d at p. 887].) Although the 1977 law does not require the jurors to specify their various reasons for imposing death, the statute contains adequate alternative safeguards for assuring careful appellate review. First, under the California law, in determining whether special circumstances exist to justify the death penalty, the trier of fact must make a special finding of the truth of each alleged special circumstance, and in case of any reasonable doubt as to a particular alleged special circumstance, the defendant is entitled to a finding that it is not true. (§ 190.4, subd. (a).) In addition, the trial court, in ruling upon the automatic application for modification of verdict (*id.,* subd. (e)), must review the evidence, consider the aggravating and mitigating circumstances, make its own independent determination as to the weight of the evidence supporting the jury's findings and verdict, and state on the record the reasons for its findings (*ibid.*).

As illustrative of the foregoing principles, in the case before us the trial judge in denying modification of the jurors' verdict of death expressly found that "The killing was willful, premeditated and deliberate . . . a coldblooded execution type slaying to do away with witnesses." The judge also outlined certain aggravating aspects of the case, including defendant's intent to execute both victims, his prior killing of a 15-year-old boy, and his commission of armed robberies shortly before the present offenses occurred. Thus, the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case.

Although, under the 1977 law, the individual jurors are not required to file a statement disclosing the precise reasons for their verdict, this omission, in our view, is not critical. The Florida statute upheld in *Proffitt* is roughly comparable to the California procedure, for it requires the jury to make a penalty recommendation to the trial judge (unaccompanied by any specific findings), and thereafter the judge determines the actual sentence and specifies in writing the reasons in support thereof. (428 U.S. at pp. 249-250 [49 L.Ed.2d at pp. 921-922].) The high court in *Proffitt* in interpreting the Florida law emphasized, "Since . . . the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible . . . ." (*Id.,* at p. 251 [49 L.Ed.2d at p. 922].)

The California procedure substantially comports with the requirements of both *Gregg* and *Proffitt* with respect to the disclosure of the reasons supporting a sentence of death.

(d) ■■■ *Burden of proof.* Defendant attacks the 1977 death penalty legislation as deficient in its failure to provide, as a prerequisite to imposition of a death sentence, that the trier of fact must find *beyond a reasonable doubt* the existence of aggravating circumstances which outweigh the mitigating circumstances. In support of his argument, defendant points to a provision of the Georgia statute upheld in *Gregg,* which provision required the jury to find beyond a reasonable doubt that at least one statutory aggravating circumstance existed in the case. (428 U.S. at pp. 164-165 [49 L.Ed.2d at pp. 869-870].)

As we have previously emphasized, however, the high tribunal in *Gregg* expressly disclaimed the thought that any particular provision of the Georgia statute was essential to its validity. (*Id.,* at p. 195 [49 L.Ed.2d at p. 887].) Again, it is clear that the Florida statute upheld in *Proffitt* contained no such "beyond a reasonable doubt" provision but, instead, merely required the sentencing authority to weigh the statutory mitigating and aggravating circumstances in determining sentence. (*Id.,* at p. 250 [49 L.Ed.2d at pp. 921-922].)

Moreover, the subject California law does provide that if a reasonable doubt exists as to whether a particular statutory special circumstance is true, the jury must find that it is not true. (§ 190,4, subd. (a).) In the present case, the jury was so instructed by the trial court. Furthermore, we think it fair to read the requirement of section 190.3 that the trier of fact "consider, take into account and be guided by" the statutory aggravating and mitigating circumstances as essentially equivalent to the provision in the valid Florida statute requiring the sentencing authority to "weigh" those factors in reaching its decision. We conclude that the 1977 death penalty law is not constitutionally vulnerable because of its failure to provide a different method of proving or weighing the relevant statutory considerations specified therein.

(e) ■■■ *Proportionality review.* Defendant further contends that the California statute lacks one essential ingredient of any valid death penalty procedure, namely, "proportionality review." He first notes that the Georgia statute upheld in *Gregg* contained a provision requiring an automatic appeal of all death sentences to the state Supreme Court, which court must "review each sentence of death and determine whether it was

imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases." (428 U.S. at p. 198 [49 L.Ed.2d at p. 888].) In *Gregg*, this provision was described as "an important additional safeguard against arbitrariness and caprice" by three justices (*ibid.*), and "[a]n important aspect" by three others (*id.*, at p. 211; see also pp. 223-224 [49 L.Ed.2d at pp. 895, 902-903]; but see *Rockwell* v. *Superior Court, supra,* 18 Cal.3d 420, 432, wherein we expressed our own doubt that proportionality review was deemed essential by a majority of the justices in *Gregg*).

Contrary to defendant's assumption, however, the lack of any *express* provision for proportionality review is not fatal to the validity of a death penalty statute. In *Proffitt* v. *Florida, supra,* 428 U.S. 242, the plurality opinion (of Stewart, Powell, Stevens, JJ.) noted that although the Florida statute contained no express provision for proportionality review, effective appellate review would be guaranteed by the requirement that the trial judge file written findings justifying the imposition of death. (P. 251 [49 L.Ed.2d at p. 922].) In addition, the opinion observed that the Supreme Court of Florida "considers its function to be to '[guarantee] that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case. . . .' [Citation.]" (*Ibid.;* see also pp. 258-259 [49 L.Ed.2d at pp. 926-927].)

Similarly, in *Jurek* v. *Texas, supra,* 428 U.S. 262, the Supreme Court reviewed and upheld a Texas statute which provided for an automatic appeal and which contained no provision for proportionality review. The high court appears to have assumed that something approximating such a review would occur under Texas procedures, for the plurality opinion (of Stewart, Powell, Stevens, JJ.) concluded that "By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution." (P. 276 [49 L.Ed.2d at p. 941].)

We think it clear from the United States Supreme Court in holdings in *Proffitt* and *Jurek* that a death penalty statute will not be struck down by the high court for lack of an express provision for proportionality review,

so long as there is an assurance that the death penalty will be applied in a reasonably consistent manner. It is of further significance to us that the United States Supreme Court has recently denied review of several death penalty cases from other states, the statutes of which also fail to provide for any proportionality review, but the courts of which have stated that they will perform a comparable function. (E.g., *Bell* v. *State* (Miss. 1978) 360 So.2d 1206, 1214-1215, cert. den. 440 U.S. 950 [59 L.Ed.2d 640, 99 S.Ct. 1433]; *Collins* v. *State* (1977) 261 Ark. 195 [548 S.W.2d 106, 115-119], cert. den. 434 U.S. 878 [54 L.Ed.2d 158, 98 S.Ct. 231], rehg. den. 434 U.S. 977 [54 L.Ed.2d 471, 98 S.Ct. 540]; *State* v. *Richmond* (1976) 114 Ariz. 186 [560 P.2d 41, 51], cert. den. 433 U.S. 915 [53 L.Ed.2d 1101, 97 S.Ct. 2988]; *State* v. *Simants* (1977) 197 Neb. 549 [250 N.W.2d 881, 890], cert. den. 434 U.S. 878 [54 L.Ed.2d 158, 98 S.Ct. 231], rehg. den. 434 U.S. 961 [54 L.Ed.2d 322, 98 S.Ct. 496]; see *Smith* v. *Com.* (1978) 219 Va. 455 [248 S.E.2d 135, 151], cert. den. 441 U.S. 967 [60 L.Ed.2d 1074, 99 S.Ct. 2419].)

In *Simants,* for example, the Nebraska Supreme Court stated that although no proportionality review is provided for by Nebraska's death penalty statute, ". . . this court . . . will perform its function of death sentence review with a maximum of rationality and consistency. While we do not have the Georgia provision for proportionality review, every capital case where there can be the slightest question will be considered in comparison with other capital cases. . . . By this means review by this court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case." (250 N.W.2d at p. 890.)

Defendant herein doubts that we can tender a similar guarantee of proportionality review sufficient to satisfy the high court, given our holding that we lack the power "to substitute [our] judgment as to choice of penalty for that of the trier of fact" in capital cases. (*In re Anderson* (1968) 69 Cal.2d 613, 623 [73 Cal.Rptr. 21, 447 P.2d 117]; see *People* v. *Mabry* (1969) 71 Cal.2d 430, 453-458 [78 Cal.Rptr. 655, 455 P.2d 759] (dis. opn.); *People* v. *Odle* (1951) 37 Cal.2d 52, 55-58 [230 P.2d 345]; § 1181, subd. 7.) In none of the cited cases, however, have we suggested that we were powerless to vacate or reduce a penalty which was so disproportionate as to amount to cruel or unusual punishment. In *Odle,* for example, we held that the central inquiry in our appellate review of the propriety of a death penalty is whether or not prejudicial error has occurred. "When . . . the trial court is vested with discretion to determine the punishment . . . *and there has been no error,* this court has no power to substitute *its* judgment for that of the trial court." (Pp. 58-59, italics

added.) A disproportionate penalty would reasonably constitute "error" within our foregoing *Odle* rationale.

Moreover, we are now guided by well established proportionality principles of general application. In reviewing assertions that a particular sentence amounts to cruel or unusual punishment under the state Constitution (art. I, § 17), we must determine whether the penalty "is so *disproportionate* to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], italics added, fn. omitted; see also *People* v. *Wingo* (1975) 14 Cal.3d 169, 182-183 [121 Cal.Rptr. 97, 534 P.2d 1001] [proportionality review on a case-by-case basis for offenses involving a wide range of conduct]; *People* v. *Anderson, supra,* 6 Cal.3d 628, 641-645 and cases cited [proportionality review in earlier death penalty cases].)

In determining disproportionality under *Lynch,* we examine "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (8 Cal.3d at p. 425.) In addition, we ascertain whether more serious crimes are punished in this state less severely than the offense in question. If so, "the challenged penalty is to that extent suspect." (*Id.,* at p. 426.) Finally, under *Lynch* we compare the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having identical or similar constitutional provisions regarding cruel and/or unusual punishment. (*Id.,* at p. 427.) Although not all of these tests of disproportionality may be appropriate in reviewing a sentence of death in a particular case, our *Lynch* principles demonstrate our awareness of a constitutionally derived responsibility to assess the proportionality of a particular punishment in criminal cases generally to assure that justice is dispensed in a reasonably evenhanded manner. Such a responsibility and commitment borne in criminal cases which invoke a more modest sanction can be no less when the penalty is the most extreme. Furthermore, our performance of this function in no way interferes with the statutory sentencing powers of the trier of fact in death penalty cases.

Defendant points out that the Legislature, in framing the 1977 death penalty laws, declined to enact proposed legislation which would have required a form of proportionality review by this court. Defendant argues that we cannot properly "read into" the 1977 law proportionality provisions which were rejected by the Legislature. We are unable to discern such a clear legislative consequence. Rather, the Legislature may

well have concluded that express provisions on the subject of proportionality were unnecessary in light of the controlling *Proffitt* and *Jurek* cases. The high court in these cases upheld death penalty statutes in Florida and Texas despite a similar lack of any express proportionality review where there was assurance that review of death penalties by state appellate courts would occur in an evenhanded and reasonably consistent form. Thus, in our view, defeat of the foregoing proposed legislation evidences no legislative intent to preclude us from exercising our review, independently imposed, in an appropriate manner to conform to minimum federal constitutional standards as defined by the United States Supreme Court.

(f) *Article I, section 27, of the California Constitution.* Defendant urges that even assuming its compliance with federal constitutional standards, we should hold the death penalty to be cruel or unusual punishment under our *state* Constitution, thereby reaffirming the conclusion which we reached in 1972 in *People v. Anderson, supra,* 6 Cal.3d 628, 656, that the death penalty is "unnecessary to any legitimate goal of the state and [is] incompatible with the dignity of man and the judicial process." Defendant acknowledges, of course, that in November 1972, the people of California adopted a constitutional amendment (art. I, § 27) which purported to overrule *Anderson* by declaring "The death penalty provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article I, Section 6 nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution." Nonetheless, according to defendant, we may disregard the initiative measure because it is either inapplicable to the present case or invalid.

(i) *Applicability to 1977 legislation.* Defendant contends that article I, section 27, by its express terms, merely validated those death penalty statutes "in effect on February 17, 1972 . . ." and that accordingly the section is inapplicable to the 1977 provisions presently before us. The argument lacks merit. As the plurality opinion in *Gregg* observed, ". . . the people of California adopted a constitutional amendment *that authorized capital punishment,* in effect negating a prior ruling by the Supreme Court of California in *People v. Anderson* . . . that the death penalty violated the California Constitution." (428 U.S. at p. 181 [49 L.Ed.2d at p. 879], italics added, fn. omitted.)

The clear intent of the electorate in adopting section 27 was to circumvent *Anderson* by restoring the death penalty *to the extent permitted by the federal Constitution.* The pamphlet sent to California voters by the Secretary of State prior to the 1972 general election reinforces this conclusion. In this document, the legislative counsel first explained that we had invalidated California's death penalty provisions, based upon the state Constitution's cruel or unusual punishment clause. The pamphlet further stated, referring to the 1972 *Furman* decision, that the United States Supreme Court itself had invalidated certain death penalty statutes which conferred uncontrolled discretion upon judges and juries regarding the penalty, but also noted that the high court's decision would not preclude the imposition of the death penalty in all cases. Finally, the pamphlet concluded that "This measure [§ 27] would, therefore, make effective the statutes of this state relating to the death penalty *to the extent permitted under the United States Constitution.*" (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 42, italics added.)

We have previously held that the ballot arguments and analysis presented to the voters in connection with a particular measure "may be helpful in determining the probable meaning" of constitutional amendments adopted by the initiative process. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) Nowhere in the comments of the legislative counsel or the arguments to the voters was there any suggestion that section 27 would validate *only* those particular statutes previously invalidated by us in *Anderson.* As the legislative counsel pointed out, the United States Supreme Court (in *Furman*) had also struck down a statute of the "uncontrolled discretion" type, but had indicated that not every death penalty provision would be invalid. The clear implication conveyed to voters was that section 27 would allow restoration of the death penalty in accordance with the standards announced by the high court. Indeed, it is noteworthy that section 27 by its terms purports to restore the death penalty statutes in effect on February 17, 1972 (the precise date *Anderson* was filed), "*subject to legislative amendment or repeal* by statute, initiative, or referendum." The 1977 death penalty provisions presently under scrutiny indubitably represent such "legislative amendments . . . by statute" aimed at conforming California law to the demands of the federal Constitution, as expressed by the high court in *Furman* and *Gregg* v. *Georgia* et al.

In *Amador Valley, supra,* 22 Cal.3d 208, 245, we reasoned that a constitutional amendment should be given a common-sense construction in accordance with the natural and ordinary meaning of its words, with a view toward fulfilling the apparent intent of the framers. In consistent fashion we think it highly unlikely that the framers of section 27, and the people who adopted it by a large majority, intended to validate only the pre-*Anderson* statutes (of a type which had *already* been held unconstitutional in *Furman*) but not to approve subsequently enacted legislation aimed at reinstating the death penalty to the extent permitted by federal constitutional law. Nothing has occurred within the ensuing seven years which changes or alters our foregoing interpretation. If anything, recent events have strengthened it. We think it significant that the Legislature adopted the 1977 legislation over the Governor's veto, necessitating the concurrence of not less than two-thirds of the membership of each house. (Cal. Const., art. IV, § 10, subd. (a).) Furthermore, just last year the people of California, again through an initiative and by an even larger majority than in 1972, extended the class of special circumstances which may invoke the penalty. The decisions of the people in 1972 and 1978 and of the Legislature in 1977 may or may not have been wise, but we think there can be no reasonable doubt as to their intention or purpose.

We conclude that, properly construed, section 27 validates the death penalty as a permissible type of punishment under the *California* Constitution.

Defendant next purports to find two technical defects in the manner in which article I, section 27, was approved.

(ii) ■ *Revision or amendment.* Defendant argues that the 1972 initiative measure which adopted section 27 was improper because it constituted a "revision" of the state charter rather than a mere "amendment" thereof. As we have recently explained, although the voters may amend the Constitution through the initiative process, a revision may not be achieved in this fashion. (*Amador Valley, supra,* at pp. 221-229; see Cal. Const., art. XVIII.) As interpreted by defendant, section 27 contemplates "removal of judicial review" of the death penalty from a carefully built state constitutional structure, thereby resulting in "a significant change in a principle underlying our system of democratic government and can only be accomplished by constitutional revision."

In *Amador Valley,* we observed that "even a relatively simple enactment may accomplish such far reaching changes in the nature of our

basic governmental plan as to amount to a revision. . . ." (P. 223.) Section 27, however, accomplishes no such sweeping result. As we have explained, we retain broad powers of judicial review of death sentences to assure that each sentence has been properly and legally imposed and to safeguard against arbitrary or disproportionate treatment. In addition, we possess unrestricted authority to measure and appraise the constitutionality of the death penalty under the federal Constitution, in accordance with the guidelines established by the United States Supreme Court. We are thus led to the conclusion that the constitutional change worked by section 27 is not so broad as to constitute a fundamental constitutional revision.

Furthermore, in *Amador Valley*, we cautioned that too strict a construction of the revision rule "would in effect bar the people from ever achieving *any* local tax relief through the initiative process." (P. 225.) Similarly, the adoption of defendant's position might effectively bar the people from ever directly reinstating the death penalty, despite the apparent belief of a very substantial majority of our citizens in the necessity and appropriateness of the ultimate punishment. Applying a reasonable interpretation, we conclude that article I, section 27, fairly may be deemed a constitutional amendment, not a revision.

(iii) ▉▉▉ *Initiative petition summary.* Finally, defendant maintains that the initiative measure by which section 27 was adopted is void because the preelection petitions which were circulated to qualify the measure contained an incomplete summary of the measure's contents. (See Cal. Const., art. II, § 10, subd. (d); Elec. Code, §§ 3502, 3503.) Particularly, defendant relies upon the fact that while indicating that the death penalty statutes would be reinstated, and that "the death penalty provided under those statutes is not cruel or unusual punishment," the summary failed to mention that the measure also would not be deemed "to contravene any other provision of this constitution."

In our view, the asserted defect in the summary is too minimal to have misled the petition signers. ▉▉▉ As we noted in *Amador Valley*, ". . . the title and summary need not contain a complete catalogue or index of all of the measure's provisions. . . . As a general rule, the title and summary prepared by the Attorney General are presumed accurate, and substantial compliance with the 'chief purpose and points' provision [of Cal. Const., art. II, § 10, subd. (d)] is sufficient. [Citation.]" (P. 243.) ▉▉▉ We think it unreasonable to conclude that any substantial number of persons would have declined to sign the initiative petition had

the summary included a reference to the provision cited by defendant. The summary substantially complied with existing legal requirements.

For the foregoing reasons we conclude that the 1977 death penalty legislation is constitutional, meeting the demands of our fundamental organic law, both federal and state.

*Disposition.*

The judgment in Crim. 20624 is reversed, and the writ of habeas corpus in Crim. 20882 is granted. Defendant is remanded to the custody of the Los Angeles Superior Court for further proceedings consistent with this opinion.

Clark, J., and Manuel, J., concurred.

**MOSK, J.**—I concur in the judgment reversing defendant's conviction and granting the writ of habeas corpus. Moreover, because the state is entitled to retry defendant on the charge of murder, it is appropriate that the court determine whether such trial can lawfully be conducted under the 1977 death penalty legislation. Although in the present posture immediate review by the United States Supreme Court is unlikely, there will be ample opportunity for such review before a capital sentence is carried out in this or any other case.

With the utmost reluctance, I have come full circle in my consideration of the death penalty in California.

In the first *Anderson* case (*In re Anderson* (1968) 69 Cal.2d 613, 635 [73 Cal.Rptr. 21, 447 P.2d 117]), upholding the death penalty, I concurred by observing that "I am bound to the law as I find it to be and not as I might fervently wish it to be."[1] In so doing, I quoted Justice Frankfurter: to yield to personal predilections would be to act willfully "in the sense of enforcing individual views instead of speaking humbly as the voice of law by which society presumably consents to be ruled. . . ." (Frankfurter, *The Supreme Court in the Mirror of Justices* (1957) 105 U.Pa.L.Rev. 781, 794).

---

[1] Justice Stewart put it this way in *Gregg v. Georgia* (1976) 428 U.S. 153, 175 [49 L.Ed.2d 859, 875, 96 S.Ct. 2909]; "we may not act as judges as we might as legislators."

Subsequently in the second *Anderson* case (*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]), I joined a majority of this court in the well-reasoned and movingly expressed opinion of Chief Justice Wright, holding that capital punishment was cruel or unusual punishment under the California Constitution (art. I, § 17). We held that while organized society permitted the death penalty in previous years—from the days of "vigilante justice and public hangings" (*id.,* p. 645)—current mores developed throughout more enlightened western societies frowned on taking a human life for even the most heinous offenses.

The people of California responded quickly and emphatically, both directly and through their elected representatives, to callously declare that whatever the trends elsewhere in the nation and the world, society in our state does not deem the retributive extinction of a human life to be either cruel or unusual. (Cal. Const., art. I, § 27, adopted Nov. 7, 1972; Stats. 1973, ch. 719, p. 1298; Stats. 1977, ch. 316, p. 1255; Pen. Code, §§ 190-190.5, added by Prop. 7, Gen. Elec. (Nov. 7, 1978).)

"Cruelty" is not definable with precision. It is in the eye of the beholder: what may be perceived as cruelty by one person is seen as justice by another. Thus, this court, in ascertaining the permissible limits of punishment, must look in the first instance to those values to which the people of our state subscribe. That as one individual I prefer values more lofty than those implicit in the macabre process of deliberately exterminating a human being does not permit me to interpret in my image the common values of the people of our state.

The day will come when all mankind will deem killing to be immoral, whether committed by one individual or many individuals organized into a state. Unfortunately, morality appears to be a waning rule of conduct today, almost an endangered species, in this uneasy and tortured society of ours: a society in which sadism and violence are highly visible and often accepted commodities, a society in which guns are freely available and energy is scarce, a society in which reason is suspect and emotion is king. Thus with a feeling of futility I recognize the melancholy truth that the anticipated dawn of enlightenment does not seem destined to appear soon.

I am therefore compelled to conclude that the 1977 death penalty legislation does not violate the California Constitution. Whether it complies with the federal Constitution is a different question that is much

more difficult to answer. The difficulty, of course, is that the United States Supreme Court has both created the problem of such compliance and failed to give the states consistent and workable guidance on how to solve it.

I need not document at length the manifest inadequacy for that purpose of the high court's first decision in this sequence, *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. The case was generally taken to stand for the proposition, expressed in various ways by a plurality of three of the concurring justices, that the death penalty constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments if it is imposed pursuant to a discretionary sentencing statute that creates a substantial risk that it will be inflicted in an arbitrary and capricious manner. No clear guidelines were provided, however, as to the precise sentencing procedures necessary to satisfy this reading of the Constitution. The court voiced its concerns in multiple opinions,[2] and it was inevitable that compliance by the states would be "not an easy task considering the glossolalial manner in which those concerns were expressed." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 317 [49 L.Ed.2d 944, 969, 96 S.Ct. 2978] (dis. opn. of Rehnquist, J.).) Yet curiously little guidance emerged from that welter of views: "the Court was practically silent with respect to what particular procedures would pass constitutional muster." (Hancock, *The Perils of Calibrating the Death Penalty Through Special Definitions of Murder* (1979) 53 Tul.L.Rev. 828, 839.) In effect the court ruled that the statute before it was unconstitutional without saying what would make it constitutional.[3]

A majority of state legislatures thereafter enacted new death penalty laws attempting to comply with *Furman* as they understood it. "Predictably, the variety of opinions supporting the judgment in *Furman* engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment. Some States responded to what was thought to be the command of *Furman* by adopting mandatory death penalties for a limited category of specific crimes thus eliminating all discretion from the sentencing process in capital cases. Other States attempted to continue the practice of individually assessing the culpability of each individual defendant convicted of a capital offense and, at the

---

[2]The decision was announced in a brief *per curiam* opinion, followed by no less than five concurring opinions and four dissenting opinions. No concurring justice, moreover, signed the opinion of any other concurring justice.

[3]The commentators echoed and amplified these criticisms. (See, e.g., Polsby, *The Death of Capital Punishment? Furman* v. *Georgia* 1972 Sup.Ct.Rev. 1; Comment, *Capital Punishment After Furman* (1973) 64 J.Crim.L. & C. 281.)

same time, to comply with *Furman*, by providing standards to guide the sentencing decision." (Fns. omitted.) (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 599-600 [57 L.Ed.2d 973, 986-987, 98 S.Ct. 2954] (plur. opn. of Burger, C.J.); accord, *Woodson* v. *North Carolina* (1976) *supra*, 428 U.S. 280, 298-299 [49 L.Ed.2d 944, 957-958] (plur. opn. of Stewart, J., Powell, J., and Stevens, J.); for a survey of such legislation, see Note, *Discretion and the Constitutionality of the New Death Penalty Statutes* (1974) 87 Harv.L.Rev. 1690.) California chose at that time to enact a statute of the mandatory death penalty type. (Stats. 1973, ch. 719; see *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 446-448 [134 Cal.Rptr. 650, 556 P.2d 1101] (conc. opn. of Clark, J.).)

In 1976 the United States Supreme Court returned to the death penalty issue in *Gregg* and its four companion cases. Clarification of *Furman* was eagerly awaited, but the hope proved in vain. Once more the court spoke with many voices,[4] the prevailing view was again that of a mere plurality of three justices, and the result was a little light but still further confusion: "The Supreme Court's five death penalty cases of 1976, like the regenerating Hydra of Greek mythology, have engendered more than one unsettled question for every issue they purportedly laid to rest." (Fn. omitted.) (Hancock, *op.cit. supra*, 53 Tul.L.Rev. 828.)

It is true the court almost settled the question of mandatory death penalty statutes, holding that solution to the *Furman* problem was constitutionally impermissible in most instances. (*Woodson* v. *North Carolina* (1976) *supra*, 428 U.S. 280; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001].)[5] As far as it went, that ruling at least was clear, and it promptly compelled our unanimous decision in *Rockwell* that California's 1973 mandatory death penalty law violated the federal Constitution.

The Legislature thereupon enacted a statute of the second type that seemed to comply with *Furman*, i.e., a statute attempting to control the exercise of the jury's discretion by various procedural devices. (Stats.

[4] The five cases produced some two dozen opinions, filling more than two hundred pages of the official reports.

[5] The court specifically left unanswered, however, the question whether a mandatory death penalty may be permissible for certain categories of murder defined largely by the "character or record" of the offender, such as a prisoner serving a life sentence or an escapee. (*Woodson*, at p. 287, fn. 7 [49 L.Ed.2d at p. 951]; see also *Roberts* v. *Louisiana* (1977) 431 U.S. 633, 637, fn. 5 [52 L.Ed.2d 637, 642, 97 S.Ct. 1993]; *Lockett* v. *Ohio* (1978) *supra*, 438 U.S. 586, 604, fn. 11 [57 L.Ed.2d 973, 990] (plur. opn. of Burger, C.J.).)

1977, ch. 316.) It is that law we now have before us. Unfortunately its validity cannot be judged so easily as its predecessor's: it hinges on the meaning not of *Woodson* and *Roberts* but of the plurality opinions in the other three cases the court decided at the same time: *Gregg* v. *Georgia, supra, Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960], and *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]. The message of the latter opinions is far less clear, however, largely because of the manner in which the court proceeded in each case: after reviewing in detail the provisions of the particular state statute in issue, the plurality concluded that those provisions—supplemented at certain critical points by state court constructions of the statute—satisfied the concerns expressed in *Furman.* But nowhere did the plurality expressly state which if any of those provisions was actually *required* to ensure the scheme's constitutionality. In effect the court ruled in each instance that the statute before it was constitutional without saying what would render it unconstitutional; it identified the sufficient but not the necessary conditions to the validity of the law.

This omission would be harmless if all the discretionary death penalty laws were similar to one or another of those approved in *Gregg* and its companion cases. But they are not—a point the plurality itself emphasized by observing that "each distinct system must be examined on an individual basis." (428 U.S. at p. 195 [49 L.Ed.2d at p. 887].) It cannot be denied that California's 1977 death penalty legislation differs in a number of respects from those of Georgia, Florida, and Texas. For example, our statute does not require the sentencing authority to expressly find that at least one of the statutory aggravating factors is proved beyond a reasonable doubt, as in Georgia (*id.* at p. 166, fn. 9 [49 L.Ed.2d at p. 870]), or that the answer to each of three questions relating to aggravating factors is affirmative beyond a reasonable doubt, as in Texas (*id.* at p. 269 [49 L.Ed.2d at p. 936], or that the aggravating circumstances in fact outweigh the mitigating circumstances, as in Florida (*id.* at p. 250 [49 L.Ed.2d at p. 921]).[6] Nor does our statute require, as in the above states, that the authority with primary responsibility for fixing the

---

[6]The latter requirement—a finding on whether the aggravating factors outweigh the mitigating factors—is now part of California law, having been added to new Penal Code section 190.3 by Proposition 7 at the November 1978 General Election. It is interesting to note that Senator John V. Briggs, a proponent of the proposition, urged in his ballot pamphlet argument to the voters that a "first-year law student could have told [the opponents of the proposition] this provision is required by the U.S. Supreme Court. The old law [i.e., the 1977 legislation now before us] does not meet this requirement and might be declared unconstitutional . . . ." (Ballot Pamp., rebuttal to argument against Prop. 7, Gen. Elec. (Nov. 7, 1978) p. 35.)

penalty (the jury in Georgia and Texas, the court in Florida) put each of the foregoing findings in writing, thereby permitting "meaningful appellate review." (428 U.S. at pp. 195, 251, and 276 [49 L.Ed.2d at pp. 886, 922, 941] [*semble*].)[7] Finally, our statute does not require that on an appeal from a judgment of death this court engage in the process of "proportionality review" prescribed by law in Georgia (428 U.S. at p. 198 [49 L.Ed.2d at p. 888]) and adopted by judicial construction in Florida (*id.* at p. 251 [49 L.Ed.2d at p. 922]) and Texas (*id.* at p. 276 [49 L.Ed.2d at p. 941] [*semble*]).

Whether these are distinctions without a difference depends in turn on whether the Supreme Court's references to the cited provisions of Georgia, Florida, and Texas law were "requirements of constitutional law, as opposed to mere beaming approval from the high bench." (Black, *Due Process for Death: Jurek v. Texas and Companion Cases* (1976) 26 Cath.U.L.Rev. 1, 2-3.) But these and numerous other questions were left unanswered by *Gregg* et al.[8] "The Supreme Court has unequivocally held that standardless death sentencing is unconstitutional, and yet in [*Gregg* et al.] it failed to provide much direction concerning what the source of

---

[7]It appears that under our statute the authority with primary responsibility for fixing the penalty is the jury. Subdivision (c) of Penal Code section 190.4 provides that if the defendant is convicted by a jury the trier of fact in the penalty phase shall be the same jury; indeed, the Legislature's strong preference for a jury trial of penalty is demonstrated by the requirement in subdivision (b) of the same section that in the absence of a waiver by both sides the penalty phase shall be tried to a jury even if the defendant was convicted by the court or by guilty plea. Nor does the jury's role appear to be advisory only, as in Florida: Penal Code section 190.3 declares no less than three times that in the penalty phase the trier of fact shall "determine" the punishment to be inflicted. By contrast, on the automatic motion for modification of the verdict provided by subdivision (e) of section 190.4, the stated function of the trial court is not to choose the appropriate penalty as a matter of first impression but simply to exercise its independent judgment "as to whether the weight of the evidence supports the jury's findings and verdicts." This, of course, is no more than the long-settled standard for reviewing *any* jury verdict on a motion for new trial based on insufficiency of the evidence. (*People v. Love* (1961) 56 Cal.2d 720, 728 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

[8]For example, must the jury unanimously agree on which aggravating factors are established by the evidence? Must they so find beyond a reasonable doubt? In order to permit "meaningful appellate review," must they make similar findings as to the mitigating factors? Before imposing a sentence of death, must they unanimously agree that the aggravating factors outweigh the mitigating factors? Must that finding also be beyond a reasonable doubt? By how much must the aggravating factors "outweigh" the mitigating factors: is it enough that the former outweigh the latter by a "slight" or "mere" preponderance, or is a heavier burden required (e.g., "substantially" outweigh) in view of the nature of the penalty?

At least as many questions remain unanswered concerning the process of "proportionality review."

standards should be. Although those cases clearly establish the importance of permitting a defendant to introduce whatever mitigating evidence he has, they do little to clarify the implementation of the mitigating factor requirement. Consequently, lawmakers and jurists face a series of confounding questions . . . ." (Liebman & Shepard, *Guiding Capital Sentencing Discretion Beyond the "Boiler Plate": Mental Disorder as a Mitigating Factor* (1978) 66 Geo.L.J. 757, 778; accord, *United States v. Kaiser* (5th Cir. 1977) 545 F.2d 467, 472 (holding a federal death penalty statute unconstitutional under *Furman* and expressing relief at being spared the task of producing a definitive exegesis of the "complex if not confounding" opinions in *Gregg* et al.).)[9]

The confusion persists to this day. In the latest death penalty decision of the Supreme Court (*Lockett v. Ohio* (1978) *supra*, 438 U.S. 586), Chief Justice Burger conceded that "We do not write on a 'clean slate.'" (*Id.* at p. 597 [57 L.Ed.2d at p. 985] (plur. opn.).) He then essayed a review of *Furman* and *Gregg* et al. (*id.* at pp. 597-601 [57 L.Ed.2d at pp. 985-988]), and concluded with the classic understatement that "The signals from this Court have not, however, always been easy to decipher." (*Id.* at p. 602 [57 L.Ed.2d at p. 988].) The Chief Justice then frankly recognized—as I here contend—that "The States now deserve the clearest guidance that the Court can provide; we have an obligation to reconcile previously differing views in order to provide that guidance." (*Ibid.*)

Regrettably he was unable to accomplish that reconciliation and furnish that guidance. On the principal holding in the case—i.e., that *Furman* and its progeny require that any and all relevant mitigating factors offered by the defendant be admissible on penalty, contrary to the Ohio death penalty statute there in issue—the Chief Justice joined the Stewart-Powell-Stevens plurality of *Gregg* et al., but was unable to muster a fifth vote to achieve a majority.[10] Dissenting on this issue, Justice Rehnquist correctly pointed out that "A majority of the Court has yet to endorse the course taken by today's plurality in using the Eighth Amendment as a device for importing into the trial of capital cases extremely stringent procedural restraints." (*Id.* at p. 632 [57 L.Ed.2d at p. 1007].) Rather, Justice Rehnquist observed, in *Furman* and *Gregg* et al.

---

[9] Again the commentators join in and expand upon this criticism. (See, e.g., *The Supreme Court, 1975 Term* (1976) 90 Harv.L.Rev. 63, 67-76; Hancock, *op.cit. supra*, 53 Tul.L.Rev. 828, 831 & fn. 14, 839-842; Black, *op.cit. supra*, 26 Cath.U.L.Rev. 1 (*passim*).

[10] The Ohio statute was nevertheless struck down because Justices Blackmun and White found it unconstitutional on wholly different grounds and Justice Marshall adhered to his *Furman* view that the death penalty is unconstitutional per se. Justice Brennan did not participate.

the court has not cleaved "to a principled doctrine either holding the infliction of the death penalty to be unconstitutional *per se* or clearly and understandably stating the terms under which the Eighth and Fourteenth Amendments permit the death penalty to be imposed. Instead, . . . the Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed." (*Id.* at p. 629 [57 L.Ed.2d at p. 1005].)

In view of the foregoing history, a state court would be rash indeed to predict how and when the United States Supreme Court will ultimately solve the problem it created in *Furman*.[11] In the meantime, I submit it would be prudent to refrain from unnecessary advisory opinions on what are the precise constitutional requirements of *Furman* and *Gregg* et al. and whether the 1977 death penalty legislation in California complies with those requirements. That issue can finally be decided, whether by this court or by the United States Supreme Court, only when there is presented on appeal an otherwise unimpeachable judgment of death. Until such a judgment is before us for review we cannot determine whether the legislation in question was constitutionally applied; and until then I also deem it appropriate to withhold a final decision on whether—and if so, how—that legislation can reasonably be construed to be constitutional on its face. For these reasons I do not join in the elaborate analysis of the 1977 law set forth in the majority opinion (*ante,* pp. 176-184).

Yet that law, like any other enactment of the Legislature, comes before us clothed with a strong presumption of constitutionality. (See, e.g., *In re Anderson* (1968) *supra,* 69 Cal.2d 613, 628; *In re Cregler* (1961) 56 Cal.2d 308, 311 [14 Cal.Rptr. 289, 363 P.2d 305]; *Lundberg v. County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1]; *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701];

[11]Perhaps it will never be satisfactorily solved. That dismaying possibility can be inferred from the candid admission of the Chief Justice in *Lockett* (*id.* at p. 605 [57 L.Ed.2d at p. 990]) that "There is no perfect procedure for deciding in which cases governmental authority should be used to impose death." Whether a civilized society should proceed with executions when it has only *imperfect* procedures for determining which of its members it will deliberately put to death is a question I leave to the consciences of the justices of the high federal bench; the issue is apparently foreclosed under the law of California as it stands today. For my part I suspect, with Professor Black, that the laws upheld so laboriously in *Gregg* et al. are "conspicuous illustrations of the fact that our legal system, after years of travail since *Furman*, cannot produce a procedure fit for choosing people to die." (Black, *op.cit. supra,* 26 Cath.U.L.Rev. 1, 16.) If this is true, the *Furman-Gregg-Lockett* plurality have been pursuing a will-o'-the-wisp.

*People* v. *Superior Court* (1937) 10 Cal.2d 288, 298 [73 P.2d 1221]; *People* v. *Globe Grain & Mill Co.* (1930) 211 Cal. 121, 127 [294 P. 3]; *People* v. *Hayne* (1890) 83 Cal. 111, 115 [23 P. 1].) Because of that presumption, "Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." (*In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296].) At the present time it does not clearly, positively and unmistakably appear to me that the 1977 death penalty legislation violates the Eighth and Fourteenth Amendments as construed in *Furman* and *Gregg* et al. The presumption of its constitutionality has therefore not been rebutted, and I join in the majority's conclusion that defendant can be retried under that statute.

Newman, J., concurred in the judgment and in the views expressed by Justice Mosk.

**BIRD, C. J.**—Although I concur in section 2 of the majority opinion, I write separately because I cannot as a matter of sound jurisprudence condone the use of dictum to uphold a now defunct death penalty statute. In using this method, the majority have insulated from review by the United States Supreme Court the decision of this court as to whether an individual will live or die.

The question as to the constitutionality of California's former death penalty statute is one on which reasonable persons may differ. One of the difficulties encountered in any systematic analysis of this area is the lack of consistent application of the rules to the cases that have come before the United States Supreme Court. I submit it is not possible for anyone to say with any certainty what the higher court will do should it ultimately pass judgment on this statute. Whatever its ultimate determination, this court should not impede that review by deciding this fundamental question in dictum.

It is a settled principle that this court does "not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (*People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000] and cases cited.) The wisdom of this time-honored rule of judicial restraint becomes evident when one considers the ever-present danger that the court may examine the challenged statute with less exactitude when an individual is to be granted relief on some other basis. The fact that this court attempted to file this case within 150 days of the certification of the record, in accord with the spirit of Penal

Code section 190.6, only reinforced this tendency. Here then lies the real possibility for judicial oversight and faulty analysis.

The majority concede that a decision on the constitutionality of former Penal Code section 190 et seq.[1] is not necessary "to dispose of the matter before us." (*People* v. *Williams, supra,* 16 Cal.3d at p. 667.) Appellant's conviction has been reversed, and he has been granted a new trial. It is doubtful that the death penalty will ever be applied to the individual before us.

However, the majority feel compelled to reach out and express themselves on this issue. In so doing they violate not only honored tenets of judicial restraint but also sound principles of federalism. On a purely federal constitutional question, the majority have effectively protected their views from review. The United States Supreme Court, which is the proper body to ultimately resolve the issue of the constitutionality of California's former death penalty statute, does not decide constitutional questions unless absolutely necessary to resolve a case. (See, e.g., *Ashwander* v. *Tennessee Valley Authority* (1936) 297 U.S. 288, 347 [80 L.Ed. 688, 711, 56 S.Ct. 466] (conc. opn. of Brandeis, J.).) Thus, even if the Supreme Court were to disagree with the majority's view that former section 190 et seq. does not violate the Eighth Amendment, the majority's error would nevertheless stand because the high court does not grant certiorari merely to correct dictum.

Is it fair or sound jurisprudence to decide the constitutionality of California's former death penalty statute in the abstract? Is it fair or sound procedure to decide this issue of life or death without an individual before this court who has been validly convicted of first degree murder and who faces death at the hands of the state if the statutory scheme is upheld? I submit it is not.

The citizens of this state and the trial courts are entitled to "know whether they have a valid death penalty." (Maj. opn., *ante,* p. 172.) However, the majority's advisory opinion will *not* settle this important question. Further, under the rules of appellate review, the majority's view is not binding authority even on this court since reaching the constitution-.l issue was unnecessary to today's judgment. (See, e.g., *Simmons* v. *Superior Court* (1959) 52 Cal.2d 373, 378 [341 P.2d 13]; *Childers* v. *Childers* (1946) 74 Cal.App.2d 56, 62 [168 P.2d 218].) In other words, any

[1] All statutory references hereinafter are to the Penal Code.

other case that might come before this court raising this issue could be the vehicle for declaring the statute unconstitutional without transgressing the principles of stare decisis.

Finally, today's decision will not determine whether there is a "valid death penalty" in this state since the statute under scrutiny here is no longer in effect, having been repealed by the people in November 1978. There are many other cases before this court on automatic appeal from sentences of death under former section 190 et seq. I would follow the respected tradition of judicial restraint and defer all discussion of the constitutional issues until a resolution is necessary to the disposition of a case.

Consider the following issues that the majority opinion decides in dictum.

1. Proportionality review is necessary under the United States Constitution to uphold a death penalty statute.

2. Proportionality review may be read into California's former death penalty statute even though the Legislature specifically and intentionally left this requirement out of the statute.

3. A new definition of proportionality review is carved out and is nothing more than a restatement of case law interpreting the Eighth Amendment as it applies to all sentences, not merely those involving the death penalty.

4. A finding is made that discretion of the sentencing authority has been "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action" under *Gregg v. Georgia* (1976) 428 U.S. 153, 189 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909], even though under the former California statute (a) the jury is not required at the penalty phase to make any special finding that one of the aggravating factors exists beyond a reasonable doubt or even by a preponderance of the evidence, and (b) there is no method by which an appellate court can determine the basis on which the jury determined that this particular individual should be put to death.

This court has no business deciding these fundamental questions in dictum, however one would resolve them. No matter how clamorous the movement of the moment, "[t]he right to be free of cruel and unusual

punishments, like the other guarantees of the Bill of Rights, 'may not be submitted to vote [and depends] on the outcome of no election.'"
(*Furman* v. *Georgia* (1972) 408 U.S. 238, 268 [33 L.Ed.2d 346, 366, 92 S.Ct. 2726] (conc. opn. of Brennan, J.).) That right should not be resolved in a context where the issue of an individual's life or death is not squarely before us. Neither the principle of judicial restraint nor the concept of essential fairness is well served by such a rush to judgment.

**TOBRINER, J.**—I concur in section 2 of Justice Richardson's opinion, which concludes that defendant's conviction must be reversed because of the failure of his trial counsel to render constitutionally adequate representation. Accordingly, I concur in the judgment reversing defendant's conviction and granting the writ of habeas corpus.

Although three of my colleagues have deemed it appropriate to speak at this time to some of the constitutional questions presented by the 1977 death penalty statute, I join with the Chief Justice and Justices Mosk and Newman in abstaining from reaching those issues. In my view our court should await a case in which a defendant actually faces execution under the 1977 law before addressing the basic constitutional questions raised by that enactment. The awesome question of whether a defendant will live or die should be framed in concrete, not abstract, terms; the decision must be reached with the realization that it will result in the designed death of an individual man or woman who stands before the court. Therefore, I do not concur in any portion of section 5 of Justice Richardson's opinion.