Filed 7/31/14  P. v. Moore CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057475 |
| v. | (Super.Ct.No. FVA901440) |
| LOUIS JEFFREY MOORE, JR., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Charles C. Ragland and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

After defendant Louis Jeffrey Moore, Jr. and his girlfriend got into a drunken argument, he shot her three times, killing her. When the police interviewed him, he admitted knowingly shooting her. At trial, however, he testified that he blacked out; when he came to, he was partially blind. He heard what he thought were "attack[ers]" moving around in the kitchen. He fired blindly, intending only to scare them away.

A jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a), 189) with an enhancement for causing death by personally discharging a firearm (Pen. Code, § 12022.53, subd. (d)). Defendant was sentenced to a total of 50 years to life in prison.

In this appeal, defendant contends:

1. The jury instructions erroneously failed to define second degree murder.

2. The jury instructions erroneously suggested that, for provocation to reduce first degree murder to second degree murder, it must meet a reasonable person standard.

3. The trial court erred by admitting defendant's ex-wife's testimony about one particular prior threat that he made to her.

4. The trial court erred by denying defendant's post-trial *Marsden* motion to the extent that it was based on defense counsel's failure to obtain a psychological evaluation.

We find no error. Hence, we will affirm.

# I

## FACTUAL BACKGROUND

A.     *Third-Party Witnesses' Accounts*.

As of August 2009, defendant's girlfriend, Jillian White, was living with him off and on.  They occupied an upstairs apartment in a fourplex in Fontana.

White drank every day.  Sometimes when she drank, her "demeanor" got "nasty." Defendant also drank occasionally.  Neighbors often heard them arguing.

There were complaints about White banging on the door, trying to get defendant to let her in.  On one occasion, paramedics were seen helping White downstairs; she had bruises on her arm.  On two occasions, the police were called; the first time, they asked White to leave, and the second time, they arrested her.  One neighbor overheard White saying, "I want to kill my boyfriend by throwing him down a flight of stairs[.]"

Margaret Delgado and her husband  Freddie Delgado  owned the fourplex and lived there as well.  On the night of August 26-27, 2009, they were hanging out in the garage, directly under defendant's apartment.  Around midnight, they heard what sounded like marbles falling onto defendant's tile floor.  Freddie heard a "thump." Margaret heard a sound like furniture being dragged.

Margaret phoned defendant and asked "Is everything okay up there?"  Defendant sounded a "little bit" drunk.  He said, "Yeah, everything is okay, we're just sitting here, [we] had an argument . . . ."  He then volunteered that he did not have any guns, knives, or weapons, and he was not a violent person.  He added that White might be pregnant and

3

"was having some little issues." White could be heard in the background, talking in a loud voice.

Stephanie Sierra and her daughter, Sara Pena, lived in the apartment next to defendant's. They heard defendant and White arguing. At one point, Pena heard White yell, "Oh my gosh[,] what are you doing?" Then both Sierra and Pena heard three gunshots. The first two shots were close together, but there was a brief pause before the final shot.

Margaret, Sierra, and a third neighbor all heard something fall onto the dirt below defendant's balcony. Sierra made out two separate sounds — a sound like a duffel bag falling, followed by a sound like a person jumping over the balcony.

When the police arrived, they found White's body lying on the kitchen floor. She had been struck by three bullets. One entered her back on an upward trajectory; one entered her back on a steep downward trajectory; and one entered her front left shoulder. Two of the three bullets caused internal bleeding, which in turn caused unconsciousness and death. White's blood alcohol level at the time of death was 0.32 percent.

A rifle was lying on the floor in the middle of the living room. It held one spent casing in the chamber and two unfired rounds in the magazine tube. There were two more spent casings on the floor.

A police officer who was familiar with that make and model of rifle testified that it has a safety. Moreover, it has to be cycled manually using a lever. The lever ejects any spent casing and moves a fresh round from the magazine tube into the chamber. Thus,

4

"[i]t takes a deliberate action every time that you fire . . . ." The officer demonstrated the lever action for the jury.

Around 12:30 p.m., the police spotted defendant walking north on Market Street in Riverside. They followed him; when they caught up with him, he was sitting on a bench in front of City Hall. They promptly arrested him.

B.      *Defendant's Statement to the Police*.

Defendant was Mirandized and gave police the following statement.

At the time of the shooting, defendant was drunk. He had had four or five shots of vodka, half a pint of cognac, and three beers. He was also smoking marijuana. White, too, was drunk. Defendant believed she was an alcoholic.

They got into an argument. At one point, defendant told White to stop drinking and smoking because she was pregnant (or so she had told him).[1] He grabbed her cigarette. White said she was going to call the police. Defendant picked up her cell phone and threw it at her. However, the battery was missing. She accused defendant of taking it. She started screaming, "[G]ive me my battery or I'm gonna call the police." Defendant said, "[L]et me give [you] a reason to call them."

Defendant went and got his rifle from his bedroom. He did not remember loading it. As he came back around the corner, White was facing him; he cocked the rifle and

---

[1]      Defendant had had a vasectomy. He claimed that he nevertheless believed that White was pregnant and that he was the father, because he had heard that "after 10 years or so it can go back together." The autopsy physician did not testify as to whether White was actually pregnant or not.

pulled the trigger.  He did not remember how many times he fired.  He saw White fall; then he left.  He walked from Fontana to Riverside.  When he saw police activity, he knew they were looking for him, so he went to City Hall and waited for them to find him.

C.     *Defendant's Testimony at Trial.*

Defendant gave the following account at trial.

About a week before the shooting, White told him that "some guy named John . . . was going to kill [defendant] because [defendant] took his girlfriend."

On the day of the shooting, both defendant and White were drinking.  When White drank, she wanted to argue and fight.  White said she was going to call John "and tell him to come over and teach [defendant] a lesson."

Defendant drank so much that he blacked out.  When he woke up again, he was partially blind.  He could not see anything at eye level; if he looked down, he could see "the ground, maybe three feet ahead . . . ."  He concluded that he had been "attacked."  He heard what sounded like "more than one [person]" moving around in the kitchen.  He got his rifle, which was already loaded, and stood in the doorway.  He was thinking, "I can scare them out of the house."

According to defendant, he did not have to turn off the safety; "when you grab the weapon, . . . [the safety] automatically goes off."  He cocked the hammer and fired.  He did not aim.  He did not remember how many times he fired.

He could not see White until she "dropped into [his] vision . . . ."  He checked her for breathing and a pulse, but found neither.  He left the apartment.  The next thing he

6

knew, he was walking into Riverside. After seeing himself on the news on television, he went to City Hall to turn himself in.

D. *Prior "Bad Acts" Evidence.*

Kimberly White was defendant's ex-girlfriend; she had lived with him from 2000 to 2005. She testified that he was usually "high or drunk or both." He was verbally abusive "all the time." He would "get into altercations with people unnecessarily."

In May 2005, during an argument, defendant grabbed her and "slammed" her to the floor "with force," hurting her ear. He punched the floor. Next, he pulled two phones out of the wall. When she called 911 on a cell phone, he ran away.

Calynn Taylor Moore was defendant's ex-wife. They were married from 1993 to 2002.

In January 2000, he got angry with her and told her to stop the car she was driving and let him out. After getting out, he punched the driver's side door of the car.

In October 2000, while speaking to her "in a hostile manner," he punched the sofa she was sitting on.

In Spring 2001, after cursing at her and calling her names, he said, "I would bust you in your MF-ing mouth if it wasn't for the fact that I know you would blow my brains out."

After the marriage ended, Taylor Moore attempted to get a restraining order against defendant. While in court, the judge asked him to identify her; he replied that "he wouldn't recognize [her] unless [she] had a bullet hole." Defendant "rant[ed]" for

7

awhile, then left the courtroom. About an hour later, three bailiffs escorted her to her car. She testified, "By then, I had fear, big fear, that I would be snipered by [defendant]."

## II

## JURY INSTRUCTIONS ON SECOND DEGREE MURDER

Defendant contends that the standard jury instructions, as they stood at the time of trial, failed to define second degree murder.

A.  *Additional Factual and Procedural Background*.

With regard to first and second degree murder, the jury was instructed with CALCRIM Nos. 520, 521, and 522.

CALCRIM No. 520, as relevant here, informed the jury that murder requires express or implied malice; it defined both concepts. It then provided:

"If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."

CALCRIM No. 521, as relevant here, defined first degree murder. It informed the jury that first degree murder requires deliberation and premeditation, which it defined. It also provided:

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder, rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

8

CALCRIM No. 522 provided:

"Provocation may reduce [a] murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

During its deliberations, the jury sent out the following question:

"We are seeking clarification on the requirements to move from murder one to murder two. If we are not unanimous on murder one, do we move to murder two?"

The trial court responded:

"For definitions of murder and degrees of murder[,] please refer back to CALCRIM 500, 520, 521 & 522.

"I cannot tell you the order in which to consider the possible verdicts (see CALCRIM 640). You may consider each crime in whichever order you choose. However, I can only accept a guilty verdict of a lesser included offense if you have unanimously acquitted the defendant on the greater offense."

B.      *Analysis*.

Defendant argues that, while the instructions stated that a murder in the absence of deliberation and premeditation is *not* first degree murder, they failed to state that it *is*

9

second degree murder.  As he points out, after the trial in this case, CALCRIM Nos. 520 and 521 were amended to make this explicit.

"When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.  [Citation.]"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

CALCRIM No. 520 stated that, if defendant killed another person with malice aforethought, he was guilty of murder.  It also stated that murder was either of the first or second degree.  CALCRIM No. 521 then stated that, if the People proved that defendant was guilty of murder, and also proved that defendant acted "willfully, deliberately, and with premeditation," defendant was guilty of first degree murder.  It necessarily followed that, if the People proved that defendant was guilty of murder, but *failed* to prove that defendant acted "willfully, deliberately, and with premeditation," defendant was guilty of *second* degree murder.

Would it be better to have stated this explicitly?  Sure.  Which is undoubtedly why the Judicial Council subsequently amended the instructions.  Nevertheless, the instructions as given were accurate and complete.  Their only flaw was that they conveyed this one particular point by necessary implication, rather than explicitly.  Hence, this case comes within the rule that "[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or

10

incomplete unless the party has requested appropriate clarifying or amplifying language. [Citation.]"  (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348.)

Defendant also notes that CALCRIM No. 522, dealing with provocation, referred explicitly to second degree murder.  He argues that the jury would have concluded that the *only* way it could find second degree murder was by *also* finding provocation.  Again, however, this overlooks the necessary implication of CALCRIM No. 521.  CALCRIM No. 521 made it clear that first degree murder requires premeditation and deliberation. Thus, the jury would have understood CALCRIM No. 522 to mean that provocation can reduce murder from first degree to second degree *because* it shows lack of premeditation and deliberation.

III

JURY INSTRUCTIONS ON PROVOCATION

Defendant contends that the standard jury instructions erroneously suggested that provocation must be reasonable to reduce first degree murder to second degree murder.

A.      *Additional Factual and Procedural Background.*

As already mentioned (see part II, *ante*), the jury was instructed on provocation using CALCRIM No. 522, which stated, as relevant here:

"Provocation may reduce [a] murder from first degree to second degree and may reduce a murder to manslaughter."

The jury was also instructed on voluntary manslaughter using CALCRIM No. 570, which stated, as relevant here:

11

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.  The defendant was provoked;

"2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3. *The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.* [¶] . . . [¶] . . .

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  *In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.* [¶] . . .

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

12

B.      *Analysis*.

Provocation is an element of "heat of passion" voluntary manslaughter. "'[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation . . . .' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.)

To reduce a murder to voluntary manslaughter, the provocation must meet an objective standard of reasonableness. "Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)

However, it has long been held that "the '"existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation"'" — an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree. [Citation.]" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

In other words, the provocation necessary to reduce first degree murder to second degree murder does not have to pass an objective test. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295–1296.) "The issue is whether the provocation precluded the

13

defendant from deliberating. [Citation.] This requires a determination of the defendant's subjective state." (*Id*. at p. 1295.)

Defendant notes that CALCRIM No. 570 specifically provided that provocation must meet a reasonable person standard for the purpose of reducing murder to manslaughter. Defendant therefore argues that the jury would have concluded that provocation must likewise meet a reasonable person standard for the purpose of reducing first degree murder to second degree murder.

Recently, in *People v. Jones* (2014) 223 Cal.App.4th 995, the court rejected an identical argument. It stated: "[T]he instructions are correct. They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation . . . can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.] As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment." (*Id*. at p. 1001.) We likewise reject defendant's contention.

## IV

## THE ADMISSION OF DEFENDANT'S EX-WIFE'S TESTIMONY

## ABOUT DEFENDANT'S CONDUCT AT A RESTRAINING ORDER HEARING

Defendant contends that the trial court erred by admitting his ex-wife's testimony about a restraining order hearing after their divorce. As noted earlier, defendant said at the hearing that "he wouldn't recognize [her] unless [she] had a bullet hole." She also testified that, when she left, she was afraid that he would "sniper[]" her.

A. *Additional Factual and Procedural Background.*

The prosecution filed a motion in limine to introduce evidence of prior "uncharged acts" that defendant had committed against his ex-girlfriend and his ex-wife.

Regarding the ex-wife, the prosecution stated: "She will . . . testify that during the marriage, there w[ere] repeated verbal threats against her by the defendant and he . . . attempted to strike her on more than one occasion. She believes that defendant was capable of killing her. After the divorce, the defendant continued to make threats and harassing phone calls."

During the hearing on the motion, defense counsel argued that the ex-wife's statements were not trustworthy.

The trial court indicated that it was "concerned" about the ex-wife's testimony because it was "remote." It was also concerned about letting her testify that she was afraid of defendant unless she explained why she was afraid.

15

It ruled that it would not admit evidence of any incidents more than 10 years before the crime. Otherwise, however, it ruled that the ex-wife's testimony was not more prejudicial than probative.

B.      *Analysis*.

We begin by pointing out what defendant is *not* arguing. First, defendant is not challenging any of his ex-*girlfriend*'s testimony. Second, he is not challenging any of his ex-wife's testimony *other than* her testimony about the restraining order hearing. Third, he does not dispute that her testimony about the restraining order hearing was generally admissible under Evidence Code section 1101, subdivision (b) and/or section 1109. His sole argument is that his ex-wife's testimony about the restraining order hearing should have been excluded under Evidence Code section 352.

Defense counsel forfeited this argument, however, by failing to object to this particular evidence on this particular ground. (Evid. Code, § 353, subd. (a).) Admittedly, the trial court did consider admissibility under Evidence Code section 352 sua sponte. At that point, however, it had to consider this issue in light of the prosecution's offer of proof, which referred only to "threats." It had no opportunity to consider defendant's present contention about the unique prejudicial nature and lack of probative value of this particular testimony. (See *People v. Solomon* (2010) 49 Cal.4th 792, 821 ["A motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on appeal at a time when the court could determine

the evidentiary question in the proper context."].) Defense counsel could have objected when the testimony came out during trial, but did not.

Defendant argues that any such forfeiture constituted ineffective assistance. "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel. [Citation.]" (*People v. Castaneda*, *supra*, 51 Cal.4th at p. 1335.) Here, defense counsel was not necessarily aware of the evidence in advance;[2] that would explain why he did not specifically object to it during the motion in limine. Later, when it came out at trial, he "could . . . have decided that objecting would focus the jury's attention on the threat incident in ways that would not be helpful to the defense." (*People v. Harris* (2008) 43 Cal.4th 1269, 1290.)

Even if not forfeited, the contention lacks merit. Defendant argues that the evidence lacked probative value because it was not similar to the charged crimes. However, it was similar enough to have probative value, because it involved a threat to shoot an intimate partner. As defendant acknowledges, he admitted shooting White, so the key issue in this case was his mental state when he shot. The fact that, in the past, when angry with an intimate partner, he had entertained thoughts of shooting her was

---

[2] It is not clear that even the prosecutor was aware that defendant's ex-wife could offer this testimony. He seems to have expected her to testify to threats that defendant made out of court, during a conversation or conversations about child custody issues. After the ex-wife testified to the incident at the restraining order hearing instead, he seemed surprised; he asked, "[Was there] any other type of incident where he made a threat like that . . . ?" She replied, "Nothing comes to memory at this time."

17

significantly probative evidence that he shot White intentionally in this case. Defendant's ex-wife's fear that defendant would "sniper[]" her was also significantly probative, because it meant that someone who knew defendant well understood his threat to be serious.

Defendant also argues that the evidence was "inflammatory." However, it involved a mere threat. The jury heard evidence that, in the current case, defendant not only threatened White, but shot her repeatedly, killing her. Thus, the prior incident pales when compared to the current offense. Moreover, there was evidence of several incidents in which defendant verbally threatened and/or physically lashed out at his ex-wife and his ex-girlfriend. Against this background, evidence of a single additional threat was not particularly prejudicial.

The fact that the trial court was not required to exclude the evidence affords a second reason for concluding that defense counsel did not render ineffective assistance — his failure to object was not objectively unreasonable. And the fact that the evidence was not particularly prejudicial affords yet a third reason — defendant cannot show that the asserted ineffective assistance had any effect on the outcome.

Finally, because the evidence was not particularly prejudicial, even assuming the trial court did err, the error was harmless.

V

DEFENDANT'S POST-TRIAL *MARSDEN* MOTION

BASED ON FAILURE TO OBTAIN A PSYCHOLOGICAL EVALUATION

Defendant contends that the trial court erred by denying his post-trial *Marsden* motion to the extent that it was based on failure to obtain a psychological evaluation.[3]

A.      *Additional Factual and Procedural Background.*

Defendant was represented at trial by an appointed member of the conflicts panel.

Before sentencing, when the probation officer interviewed defendant, defendant said he wanted a *Marsden* hearing.  As a result, on the date set for sentencing, the trial court held a *Marsden* hearing in camera.[4]

The trial court allowed defendant to state all of the reasons why he believed he had received ineffective assistance of counsel.  One of the many reasons he stated was that defense counsel had never requested a psychological evaluation of him.

---

[3]      A "*Marsden* motion" is a motion to discharge existing appointed counsel, based on ineffective assistance, and to appoint new counsel.  (*People v. Marsden* (1970) 2 Cal.3d 118.)

[4]      The reporter's transcript of the *Marsden* hearing was filed as confidential. (See Cal. Rules of Court, rule 8.45(b).)

In his opening brief, defendant discussed the events at the *Marsden* hearing and cited the confidential transcript.  Defendant did not seek to file the brief under seal (Cal. Rules of Court, rule 47(b)(3)) and did not oppose the People's request for a copy of the confidential transcript (Cal. Rules of Court, rule 8.47(b)(2)(C).)  We therefore deem defendant to have waived any claim of attorney-client privilege or work product protection for the contents of the transcript.  (Evid. Code, § 912, subd. (a); *DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671, 688.)

The trial court then allowed defense counsel to respond. Regarding a psychological evaluation, he stated, "[T]here were too many downside risks involved there." He explained that his "greatest fear" was that a psychologist might conclude that defendant was malingering. He noted that, despite defendant's claim to have had a blackout, defendant had been able to remember some events before, during, and after the shooting. He added: "[Defendant] knows more about that incident than what he's saying. There's times that he's telling me what happened. There's times that he does not remember. However, when there's something that he deems helpful to him, he remembers it and he could tell it to me in very vivid, articulate detail. . . . [T]hen at other times he does not remember, and he vacillates . . . on these statements at different times."

Defense counsel also stated: "And when the People, the prosecutor, if they were to get ahold of that information, it is devastating to the defense. [¶] [M]y experience has been any time a mental health expert comes in and mentions the word 'malingering,' it's devastating. It's taken as, 'Oh, he's exaggerating,' 'He's not being truthful,' 'He's trying to use this process to help himself,' and it does not bode well. I did not feel it was worth the risk."

Finally, defense counsel was concerned that, if defendant did talk to a psychologist, there might be an issue regarding "false evidence."

When defense counsel was done, the trial court allowed defendant to respond. Defendant did not say anything further about a psychological evaluation.[5]

The trial court denied the motion.

B.    *Analysis*.

"When a defendant seeks to obtain a new court-appointed counsel on the basis of inadequate representation, the court must permit her to explain the basis of her contention and to relate specific instances of inadequate performance.  The court must appoint a new attorney if the record clearly shows the current attorney is not providing adequate representation or that defendant and counsel have such an irreconcilable conflict that ineffective representation is likely to result.  [Citations.]"  (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623.)

"[A] defendant is entitled to appointment of substitute counsel upon a proper showing posttrial . . . as well as pretrial."  (*People v. Smith* (1993) 6 Cal.4th 684, 692.) "A defendant is entitled to competent representation at all times, including presentation of a new trial motion . . . .  Thus, when a defendant satisfies the trial court that adequate grounds exist, substitute counsel should be appointed.  Substitute counsel could then

---

[5]    The numerous other grounds that defendant offered for his *Marsden* motion are not relevant to this appeal.  However, we commend the trial judge (the Hon. Steven A. Mapes) for his careful and methodical consideration of all of those grounds.  The hearing was "the very model of a modern [*Marsden* hearing]."  (Gilbert & Sullivan, The Major General's Song (1879).)

21

investigate a possible . . . motion for new trial based upon alleged ineffective assistance of counsel." (*Id*. at pp. 695-696.)

"If the court holds an adequate hearing, its ruling is reviewed for abuse of discretion. [Citation.]" (*People v. Rodriguez*, *supra*, 58 Cal.4th at p. 623.)

Defendant argues that defense counsel's claimed reason for not obtaining a psychological evaluation was unsound, because, even if the psychological evaluation showed malingering, the prosecution could not obtain it in discovery. Under Penal Code section 1054.3, subdivision (a)(1), the defense is not required to provide an expert's report in discovery unless it intends to call the expert and/or introduce the report at trial. (*Sandeffer v. Superior Court* (1993) 18 Cal.App.4th 672, 678.)

This overlooks the fact that, if the psychological evaluation did show malingering, it simply would not be helpful to the defense. If, on the other hand, the psychological report did not show malingering, then once defense counsel declared his intent to call the psychologist as a witness, the prosecution would become entitled to have its own psychologist examine defendant. (Pen. Code, § 1054.3, subd. (b)(1).) Defense counsel could reasonably be concerned that, even if his own expert found no malingering, a prosecution expert might.

Defendant also criticizes defense counsel for relying on his own nonexpert opinion that defendant was malingering. However, his explanation for suspecting malingering was reasonable, and the trial court could reasonably accept it. Even though he was not a psychologist, he had to make the strategy call one way or another, and in his opinion as

an attorney, it turned in part on how likely it was that a psychologist would find that defendant was malingering. This is the kind of decision that a nonexpert often has to make in deciding whether to call in an expert.

Defendant argues that a psychological evaluation was relevant not only to unconsciousness, but also to intoxication; an expert could have testified that defendant was, in fact, intoxicated, and could have testified about the effects of intoxication on deliberation and premeditation. It is not clear, however, what an expert could have added. If the facts were as defendant claimed — i.e., he had consumed a half pint of cognac, four or five vodka shots, and two or three beers, along with marijuana — it did not take an expert to conclude that he was intoxicated. It also did not take an expert to conclude that he would have had a reduced ability to deliberate and premeditate. Finally, an expert would have no magic way of knowing if defendant's claim was, in fact, true.[6]

Defendant relies on *People v. Frierson* (1979) 25 Cal.3d 142, which held that trial counsel was ineffective in failing to consult an expert about whether the defendant's use of PCP and Quaalude would support a defense of diminished capacity. (*Id*. at pp. 159-164.) The court cautioned, however, "We should not be understood as requiring that trial counsel must seek psychiatric or expert advice in every case wherein drug intoxication is a possible defense." (*Id*. at p. 164.) It emphasized that diminished capacity was the "sole

---

[6]    During the *Marsden* hearing, defense counsel revealed that defendant's blood had been tested 12 hours after the shooting, and that the test showed a blood alcohol level of zero.

23

defense" (*id*. at p. 159), so that the failure to present expert testimony was effectively a failure to present a defense at all. (*Id*. at p. 163.) Moreover, the ineffective assistance claim was supported by the declaration of an expert psychologist to the effect that PCP intoxication could mimic schizophrenia. (*Id*. at p. 159.) This was testimony that went beyond common knowledge. Indeed, the court stated, "such evidence could not be effectively presented through lay witnesses." (*Id*. at p. 164.) Here, intoxication was not the sole defense and it could be presented adequately through testimony by lay witnesses.

We therefore conclude that the trial court did not abuse its discretion by denying defendant's *Marsden* motion.

## VI

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
                                                        J.

We concur:

RAMIREZ _____
                    P. J.

MILLER _____
                    J.

24